IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,254






EX PARTE CARL HENRY BLUE, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


IN CAUSE NO. 23293-272 FROM THE


272
ND DISTRICT COURT OF BRAZOS COUNTY






 Price, J., delivered the opinion of the Court in which Meyers, Johnson, Keasler,
Hervey, Holcomb and Cochran, JJ., joined. Keller, P.J., filed a concurring opinion. 
Johnson, J., filed a concurring opinion. Womack, J., concurred in the result.



O P I N I O N



 This is a subsequent application for writ of habeas corpus in a capital case, in which
the applicant claims that he cannot be subjected to the death penalty, consistent with Atkins
v. Virginia, (1) because he is mentally retarded. Although the applicant filed his initial post-conviction application for writ of habeas corpus almost a year after the Supreme Court
decided Atkins, the applicant failed to raise the issue of mental retardation in that initial writ
application. He therefore makes no attempt to argue that we have authority to review his
claim under Article 11.071, Section 5(a)(1) of the Code of Criminal Procedure. (2)

 Instead, the applicant makes two alternative arguments. First, he asserts that we may
reach the merits of his claim of mental retardation under Article 11.071, Section (5)(a)(3). (3) 
Under this provision, a subsequent capital habeas applicant is entitled to a merits-review of
a claim if he can show by clear and convincing evidence that, but for a violation of the
United States Constitution, "no rational juror would have answered in the state's favor one
or more of the special issues that were submitted to the jury in the applicant's trial under
Article 37.071[.]" (4) Alternatively, the applicant asserts that, because the Eighth Amendment
prohibition against executing the mentally retarded is absolute, we should suspend all notions
of waiver, forfeiture, procedural default, and abuse of the writ, and abandon any otherwise-valid interest the State may have in the finality of the judgment, and permit him to proceed
with his claim, notwithstanding whatever statutory impediments exist to his raising the claim
in a subsequent writ application. We filed and set this subsequent application to consider
whether the applicant should be allowed to proceed on either of these bases.

 We hold that, having afforded the applicant one opportunity to raise his Atkins claim
in a post-conviction setting, the Texas Legislature may legitimately limit any second chance
it may afford him to raise it again, notwithstanding the absolute nature of the prohibition
against executing the mentally retarded. We conclude that through Article 11.071, Section
5(a)(3), the Legislature has provided a mechanism whereby a subsequent habeas applicant
may proceed with an Atkins claim if he is able to demonstrate to this Court that there is
evidence that could reasonably show, to a level of confidence by clear and convincing
evidence, that no rational finder of fact would fail to find he is mentally retarded. However,
because we find that the applicant in this case has failed to satisfy this heightened-threshold
burden, we deny him leave to proceed.

I. IS ATKINS SUBJECT TO THE ABUSE-OF-THE-WRIT DOCTRINE?


 The applicant argues that the Eighth Amendment prohibition against executing the
mentally retarded is absolute, and for that reason can be raised "at any time." He argues that
the Atkins bar against executing the mentally retarded amounts to what, in Marin v. State, (5)
we characterized as an "absolute systemic . . . prohibition." (6) In a different procedural
context, the Supreme Court has identified a rule barring execution of the mentally retarded
as one "prohibiting a certain category of punishment for a class of defendants because of
their status or offense." (7) To permit the execution of a mentally retarded offender is thus, the
applicant argues, "beyond the power of the criminal law-making authority[.]" (8) But we need
not reach the question whether Atkins has identified a systemic prohibition under Marin. For
even if we were to agree that "implementation" of such a prohibition "is not optional and
cannot, therefore, be waived or forfeited by the parties[,]" (9) this does not necessarily mean,
as the applicant contends, that an allegation that the constitutional prohibition applies can be
made, literally, "at any time" or that otherwise-legitimate state limitations on post-conviction
proceedings must give way to any allegation, however well substantiated, of mental
retardation.

 We did not say in Marin that even an absolute requirement or prohibition could
necessarily be raised at any time. The question in Marin was whether a particular claim, not
brought to the trial court's attention, could be raised for the first time on appeal. We
observed during the course of our analysis that:

 the right to appeal is not of constitutional magnitude, but is conferred by the
Legislature. * * * And that which the Legislature may withhold altogether,
it may withhold in part. Thus, our lawmakers may deny the right to appeal
entirely or the right to appeal only some things or the right to appeal all things
only under some circumstances. (10)


Accordingly, when we came later to describe the nature of absolute requirements and
prohibitions, we observed:

 Finally, absolute requirements and prohibitions, like rights which are waivable
only, are to be observed even without partisan request. But unlike waivable
rights, they can't lawfully be avoided even with partisan consent. 
Accordingly, any party entitled to appeal is authorized to complain that an
absolute requirement or prohibition is violated, and the merits of his complaint
on appeal are not affected by the existence of a waiver or a forfeiture at trial. (11)


Thus, the proposition that an absolute prohibition may be raised for the first time on appeal
is subject to the predicate right to appeal in the first place. The existence of an absolute
prohibition, even one that derives from the federal constitution, does not mandate that states
create a right to an appellate forum in which to vindicate it.

 As is the case with direct appeal, "[s]tates have no obligation to provide" the post-conviction writ of habeas corpus. (12) Of course, Texas law does provide for such writs. But
what state law may withhold altogether, it may withhold in part.

 Article V, Section 5 of the Texas Constitution provides this Court with authority to
entertain post-conviction writs of habeas corpus. (13) Since amendment to this provision in
1977, however, that constitutional authority has been expressly made "[s]ubject to such
regulations as may be prescribed by law," which is to say, the Legislature. In 1995, the
Legislature exercised that constitutional regulatory authority to promulgate Article 11.071,
including the abuse-of-the-writ provisions found in Section 5 of that statute. (14) More than a
year later, in Ex parte Davis, (15) this Court upheld the validity of the Legislature's exercise of
this regulatory authority, and specifically its authority to impose limitations on successive and
abusive state post-conviction writs, (16) against an array of constitutional challenges. Thus,
subject only to the state constitutional mandate that the writ of habeas corpus "shall never be
suspended[,]" (17) it is by now well established that the Legislature may regulate the right to the
writ of habeas corpus, and that such regulation legitimately may include imposing limitations
on the ability of a post-conviction habeas applicant to file multiple writ applications
challenging the same capital murder conviction. (18)

 Accordingly, whether an Atkins claim can be recognized for the first time in a second
post-conviction writ application will depend exclusively upon whether it fits the criteria of
Article 11.071, Section 5. (19) For those habeas applicants who filed their initial writs before
Atkins was decided, this has not been an impediment, so long as they can establish a prima
facie case for mental retardation. (20) But for an applicant such as Blue, who filed his initial
writ application after Atkins and nevertheless failed to invoke the absolute constitutional
prohibition against executing the mentally retarded in that initial writ, the decision whether
to permit him to proceed will be purely a function of whether he can meet one of the other
criteria of Article 11.071, Section 5. (21)

 Contrary to the applicant's assertion, application of Section 5 does not violate the
federal constitution just because it might deny a particular applicant review of an allegation
of facts that, if true, might impose a fundamental bar to execution. Indeed, current federal
law would deny review on the merits to a similarly situated federal habeas petitioner. The
Antiterrorism and Effective Death Penalty Act (AEDPA), (22) does not, at least on its face,
permit such a claim to be raised in "a second or successive" federal habeas corpus petition. (23) 
It is unlikely the Supreme Court would ever hold the federal regime unconstitutional, given
its own development, in extensive case law prior to the AEDPA, of rules governing the
cognizability in federal habeas corpus of successive, abusive, and defaulted claims. (24) In that
case law, the Supreme Court has never identified a constitutional prohibition it regarded as
so absolute that it would wholly nullify the State's otherwise legitimate interest in finality of
its judgments upon the mere allegation that the prohibition applies.

 Before the advent of the AEDPA, the federal doctrine of abuse of the writ was "a
complex and evolving body of equitable principles informed and controlled by historical
usage, statutory developments, and judicial decisions." (25) The doctrine ultimately evolved
into a rule that defined whether a federal habeas petitioner could proceed with a successive
or abusive petition along the same lines that the Supreme Court had earlier defined whether
a federal court could entertain a claim that had been procedurally defaulted during state
proceedings. (26) That is to say, in the federal system, a petitioner would be allowed to proceed
to the merits of a claim in a successive or abusive writ if he could demonstrate "cause" for
his failure to raise that claim in his prior writ or writs, and "prejudice" that he would suffer
should the federal courts decline to entertain it. (27) Alternatively, if he could not demonstrate
the requisite "cause and prejudice," the petitioner would still be permitted to proceed with
his successive or abusive claim if he could show that "a fundamental miscarriage of justice
would result from a failure to entertain the claim." (28)

 The Supreme Court has construed "fundamental miscarriage of justice" to mean one
of two things: "actual innocence," (29) and "actual innocence of the death penalty." (30) 
Demonstrating either of these circumstances would act as a gateway, allowing the subsequent
federal habeas petitioner to proceed on the merits of his underlying federal constitutional
claim. But the Supreme Court has yet to expressly take "actual innocence" beyond this
gateway function. It has never definitively acknowledged that a subsequent federal habeas
petitioner would be allowed to proceed on a bare claim of actual innocence, unaccompanied
by some federal constitutional defect in the trial proceedings. (31) The Supreme Court has
intimated, on more than one occasion, that a federal petitioner attempting to raise such a
claim in a successive or abusive writ would have to satisfy an extraordinarily high threshold
burden to show his innocence. (32) It has never gone so far even as to suggest, however, that
a federal petitioner could raise a bare claim of actual innocence of the death penalty in a
subsequent federal habeas petition. (33)

 "The quintessential miscarriage of justice is the execution of a person who is entirely
innocent." (34) And yet, even in that context, the Supreme Court has determined that, before
a federal habeas petitioner may proceed on the merits of a successive or abusive petition, he
must meet an extraordinarily high threshold burden. (35) Surely it would be worse to execute
a man who was unquestionably innocent than it would be to execute a man for whom there
is no question he committed a capital crime, but who is mentally retarded. Still, the Supreme
Court would impose a high threshold burden on the petitioner who would wait to show his
actual innocence until a subsequent writ application. We do not think the Constitution is
more solicitous of the mentally retarded petitioner who files a subsequent petition than it is
of the actually innocent petitioner who files a subsequent petition. Thus, we reject any
assertion that, because the Eighth Amendment erects an absolute bar to executing the
mentally retarded, an applicant must be permitted to proceed with his subsequent writ
application upon no more than a bare allegation of mental retardation, whether or not he
would be allowed to proceed under the express provisions of Article 11.071, Section
5(a)(3). (36)

 We turn next, then, to the question whether, and if so, under what conditions, Article
11.071, Section 5(a)(3) does accommodate a claim of mental retardation, raised for the first
time in a subsequent writ after an initial writ, filed post-Atkins, failed to raise it.

II. ARTICLE 11.071, SECTION 5(a)(3)


 In its totality, Section 5(a)(3) of Article 11.071 reads:

 Sec. 5. (a) If a subsequent application for a writ of habeas corpus is
filed after filing an initial application, a court may not consider the merits of
or grant relief based on the subsequent application unless the application
contains sufficient specific facts establishing that:


* * *



 (3) by clear and convincing evidence, but for a violation of the
United States Constitution no rational juror would have
answered in the state's favor one or more of the special issues
that were submitted to the jury in the applicant's trial under
Article 37.071 or 37.0711.


The Legislature quite obviously intended this provision, at least in some measure, to mimic
the federal doctrine of "fundamental miscarriage of justice."

 As we have noted, this federal doctrine operates to excuse procedural default, failure
to exhaust, and failure to fully develop the evidentiary basis for a claim in state court, as well
as successive or abusive federal writs, thus allowing the federal habeas petitioner to proceed
on the merits of his claim where he would otherwise be barred. (37) In the context of capital-punishment proceedings, fundamental miscarriage of justice means "actual innocence of the
death penalty." (38) The Supreme Court has limited the application of innocence in this context
to constitutional error that affects the habeas petitioner's eligibility for the death penalty
under state law. It has expressly rejected the argument that a constitutional error that impacts
only the jury's discretion whether to impose a death sentence upon a defendant who is
unquestionably eligible for it under state law can be considered sufficiently fundamental as
to excuse the failure to raise it timely in prior state and federal proceedings. (39)

 Section 5(a)(3) of Article 11.071 represents the Legislature's attempt to codify
something very much like this federal doctrine of "actual innocence of the death penalty" for
purposes of subsequent state writs. (40) By tying the exception to the general prohibition on
subsequent state writs specifically to the statutory special issues in Article 37.071 of the Code
of Criminal Procedure, (41) the Legislature apparently intended to codify, more or less, the
doctrine found in Sawyer v. Whitley. (42) This reading of the exception seems to limit its
applicability to constitutional errors that affect the applicant's eligibility for the death penalty
under state statutory law.

 But what if it is the constitution itself that prohibits execution, rather than a
constitutional error that affects the statutory criteria for eligibility for the death penalty? In
other words, what if the applicant is constitutionally ineligible for the death penalty, rather
than statutorily ineligible? At least one judge on the United States Fifth Circuit Court of
Appeals understands the federal doctrine of fundamental miscarriage of justice to include
constitutional as well as statutory ineligibility for the death penalty. (43) The language of
Article 11.071, Section 5(a)(3) is broad enough on its face to accommodate an absolute
constitutional prohibition against, as well as statutory ineligibility for, the death penalty.

 A subsequent state habeas applicant may proceed with his claim under Section 5(a)(3)
if he can show to the requisite level of confidence that no rational juror "would" have
answered at least one of the statutory special punishment issues in the State's favor. Thus,
if constitutional error in the case so permeated the State's evidence relevant to one of the
special issues upon which it carries the burden of proof that, absent the error, it is practically
inconceivable that any rational juror would actually answer the special issues in a way that
mandates the death penalty, then the applicant may raise the merits of that error in a
subsequent writ application. It is not hard to imagine that errors of this gravity will likely be
quite rare - as was, no doubt, the legislative intent.

 Far less rare, relatively speaking, will be the capital habeas applicant who is
constitutionally ineligible for the death penalty because he is mentally retarded, or was a
juvenile at the time of his offense. (44) Upon satisfactory proof at trial that a capital murder
defendant is mentally retarded or was a juvenile, no rational juror would answer any of the
special issues in the State's favor, if only for the simple reason that the statutory special
issues would not be submitted to the jurors in the first place. Because the constitution
absolutely prohibits imposing the death penalty upon a mentally retarded or juvenile
offender, once it has been definitively shown at trial that the offender was in fact retarded or
a juvenile, no jury would even have occasion to answer the statutory special issues. In short,
no rational juror would answer the special issues in favor of execution because no rational
juror could, consistent with the Eighth Amendment.

 When it fashioned its "actual innocence of the death penalty" doctrine, the Supreme
Court had not yet decided that the Eighth Amendment absolutely prohibits the execution of
both the mentally retarded and juvenile offenders. Construing Section 5(a)(3) as we do
today, to embrace constitutional as well as statutory ineligibility for the death penalty, is both
consistent with the plain language of the statute, (45) and at the same time accommodates the
Atkins and Roper prohibitions. We hold that a state habeas applicant alleging mental
retardation for the first time in a subsequent writ application will be allowed to proceed to
the merits of his application under the terms of Section 5(a)(3)-at least so long as he alleges
and presents, as a part of his subsequent pleading, evidence of a sufficiently clear and
convincing character that we could ultimately conclude, to that level of confidence, that no
rational factfinder would fail to find he is in fact mentally retarded. (46)

III. CLEAR AND CONVINCING EVIDENCE


 The state habeas applicant who alleges that he is mentally retarded in an initial post-conviction writ application must prove it by a preponderance of the evidence in order to
obtain relief on his claim. (47) The subsequent state habeas applicant proceeding under Article
11.071, Section 5(a)(1), who filed an initial writ application before Atkins, and thus could not
have been expected to raise it initially, must make a prima facie showing of mental
retardation in his subsequent pleading, and then, if granted leave to proceed by this Court,
must establish in the subsequent proceedings that he is mentally retarded by a preponderance
of the evidence. (48) The Legislature has determined, however, that the State's interest in the
finality of its judgments justifies the imposition of higher burdens upon the subsequent
applicant who did not avail himself of the opportunity and resources available to him at trial
or in an initial writ to raise his claim of mental retardation. For the post-Atkins applicant who
bypassed the opportunity to raise mental retardation at trial or in an initial writ, Section
5(a)(3) mandates that his subsequent application "contain[ ] sufficient specific facts" that,
if true, would establish "by clear and convincing evidence" that no rational fact finder would
fail to find him mentally retarded.

 We do not construe Section 5(a)(3), however, to require that the subsequent applicant
must necessarily convince this Court by clear and convincing evidence, at the threshold, that
no rational factfinder would fail to find he is mentally retarded. Section 5(a)(3) of Article
11.071 does not authorize this Court to grant relief on a subsequent writ application, but only
to review the adequacy of the pleading. The statutory scheme as a whole does not call upon
us to make a determination of the merits of a subsequent writ application at this juncture. (49)
All we can do at this stage of the proceeding is to issue an order, either finding that the
requirements under Subsection 5(a)(3) have been met, and the writ should issue and proceed
in the ordinary course as an initial writ would, or that the requirements have not been met,
and the writ should be dismissed. (50) It would be anomalous to require the applicant to actually
convince us by clear and convincing evidence at this stage. Indeed, if we were to require that
the subsequent application actually convince us to that level of confidence, there would be
no need to return the application to the convicting court for further proceedings.

 Instead, we construe Article 11.071, Section 5(a)(3) to require a threshold showing
of evidence that would be at least sufficient to support an ultimate conclusion, by clear and
convincing evidence, that no rational factfinder would fail to find mental retardation. A
threshold showing that would allow the finder of fact to conclude no more than that the
evidence preponderates in favor of a finding of mental retardation will obviously not suffice
at this juncture. But the applicant who can make a threshold presentation of evidence that,
if true, would be sufficient to show by clear and convincing evidence that no rational
factfinder would fail to find him mentally retarded will be allowed to proceed to the merits
of his claim in a subsequent writ application. (51) Of course, during the course of those
proceedings he must, as a predicate to eventually obtaining habeas corpus relief, present a
case for mental retardation that actually does convince this Court by clear and convincing
evidence that no rational factfinder would fail to find him mentally retarded.

IV. APPLICATION OF ARTICLE 11.071, SECTION 5(a)(3) TO THE FACTS


 Since Briseno, we have essentially defined mental retardation in accordance with the
criteria adopted by the American Association on Mental Retardation: 1) significant sub-average general intellectual functioning, usually evidenced by an IQ score below 70, that is
accompanied by, 2) related limitations in adaptive functioning, 3) the onset of which occurs
prior to the age of 18. (52) In his subsequent writ application, the applicant has proffered some
anecdotal evidence from which we could conclude that he does indeed suffer from some
adaptive deficits which manifested before he was 18 years old. He offers sketchy grade
school records that show that he performed poorly in his academic classes, was socially
promoted several times, had to repeat the eighth grade, and eventually left school altogether. 
But the only IQ score alleged comes from the applicant's trial, where an expert testified that,
based upon incomplete testing, he estimated the applicant's IQ to fall between 75 and 80. 
There is no evidence, or even an allegation, that the applicant's poor academic performance
was necessarily a product of, or that his apparent adaptive deficits were related to,
significantly below average general intellectual functioning. In the absence of such a
connection, we cannot say that the applicant has presented threshold evidence sufficient to
support a firm belief or conviction that he is mentally retarded. Indeed, the only expert
opinion that the applicant offers is that the "paucity of information presented . . . makes it
impossible to conclude whether [the applicant] is mentally retarded[,]" so that the best the
expert can say is that the applicant "might well be mentally retarded and nothing that I have
seen is inconsistent with that determination."

A. School Records


 After reviewing the incomplete school records that the applicant has attached to his
subsequent writ application, Dr. James R. Patton, Ed.D., (53) an expert with "29 years of
experience working with individuals with mental retardation[,]" summarized the records in
his attached "Declaration," and assessed them as follows:

 Mr. Blue's school records indicate a number of troubling areas. There is a
consistent inability to perform academically. In the fourth grade, he is failing
most of his courses and is placed into the fifth grade, having not successfully
met the academic grade level expectations of fourth grade. In the fifth grade,
he is placed in remedial classes and there is a notation that he is in Special
Education. At the end of the 76-77 school year, he is again placed in the sixth
grade, once again having not successfully met the academic grade level
expectations of fifth grade. This is indicative of "social promotion," a practice
used by some school districts to avoid stigmatizing those students whose
learning skills, for whatever reason, were significantly impaired. It was simply
recognition that holding these types of students back would accomplish little
or nothing; the students were unlikely ever to learn the requisite material to
justify academic promotion. These grades continue throughout Mr. Blues's
school career; by eighth grade, he is still in remedial classes.


Indeed, the applicant was made to repeat the eighth grade, and apparently dropped out mid-way through his second go-round, failing again, and was accepted into the Job Corps. Dr.
Patton's assessment continues:

 This inability to achieve in school even modest results is supported by his test
results on the California Comprehensive Test of Basic Skills. Like most such
tests, the CTBS measures acquired knowledge and cannot be used as a
measure of intellectual functioning. Recognizing the intended purposes of the
CTBS, one can use the results as an indicator of impaired learning ability that
may be attributable to mental retardation. The two years of CTBS scores in
1978 and 1979, when he was 13 and 14 years old, indicate that he was
functioning on an acquired knowledge level at the third grade on average. 
Some levels were as high as the 4th grade, others at the 2nd grade.


That the applicant's academic woes were not necessarily a product of mental retardation is
underscored by Dr. Patton's closing observations with respect to the school records:

 Clearly, these deficits in learning ability, may well be attributable to causes
other than mental retardation; for example, learning disabilities and/or an
impoverished family background may well have played a role, even a
determinative one. Mental retardation, however, cannot be ruled out and
additional assessment methods should be authorized and employed to
determine this.


B. Adaptive Deficits


 The applicant has attached statements from family members, an older friend who grew
up around the applicant, and one of applicant's former employers. (54) They provide sketchy,
anecdotal evidence and opinions to the effect that the applicant, even from earliest times, was
gullible and susceptible to getting into trouble at the instigation of others, could barely read,
could not follow any but the simplest instructions, could not manage or even count money,
could not fill out job applications on his own, was capable of only the most menial jobs,
which he did not hold for long, and was generally incapable of planning ahead, thinking for
himself, or getting by day-to-day without assistance. The applicant does not include results
from any of the available standardized scales for assessing adaptive deficits. (55)

 Dr. Patton concludes that this anecdotal evidence would "support a claim of mental
retardation." Conceding once again that "there are other possible explanations for these
problems," he asserts that "mental retardation certainly cannot be ruled out and indeed, is
strongly suggested by this pattern of adaptive deficits." But, as we have noted, the applicant
has produced little to indicate that his adaptive deficits, if any, are related to significantly
subaverage general intellectual functioning.

C. IQ Score


 The only evidence of an IQ score is testimony during the applicant's trial from Dr.
Windell Dickerson, a defense expert who was called to testify with regard to the issue of
future dangerousness. In the course of Dickerson's evaluation of the applicant, he apparently
administered "only a few subtests in the Verbal portion of the original WAIS (Weschler
Adult Intelligence Scale) test." From that limited testing he extrapolated a full scale IQ of
between 75 and 80. In a "Declaration" attached to the applicant's subsequent writ
application, Dickerson explains that at the time of trial he did not think it was important to
administer the full scale test because he "was just trying to get a general sense of [the
applicant's] intelligence level" to facilitate his opinion of future dangerousness. (56) Had he
been aware of the applicant's school records and adaptive deficits, Dickerson "would have
strongly urged trial counsel to utilize a full scale assessment of [the applicant's] intellectual
functioning using an instrument reliable for that purpose."

 The applicant argues that short form testing such as that which Dickerson utilized is
not a reliable measure of IQ. Alternatively, he maintains that because the original WAIS was
standardized in 1954, utilizing a phenomenon called the "Flynn Effect," (57) Dickerson's
estimate, if credited at all, ought to be adjusted to reflect an IQ of between 64 and 69. This
Court has never specifically addressed the scientific validity of the Flynn Effect. Nor will
we attempt to do so now. Rather than try to extrapolate an accurate IQ by applying an
unexamined scientific concept to an incomplete test score, we will simply regard the record
as it comes to us as devoid of any reliable IQ score. We hold that the only evidence of an IQ
score that the applicant has tendered fails to present sufficient specific facts that, even if true,
would establish significant sub-average general intellectual functioning by clear and
convincing evidence.

D. Expert Opinion


 Dr. Patton (who nowhere in his declaration addresses the applicant's IQ score, or lack
thereof) concludes:

 Viewed in isolation, none of these factors would be dispositive; taken as an
overall pattern, mental retardation is strongly suspected. Only a full and
thorough assessment, however, can answer that question.


However, without an IQ score that is indicative of significant sub-average intelligence, the
only proof the applicant has offered is his poor school performance, which Patton admits
could be the result of other factors. Without more compelling proof, we cannot readily infer
that the applicant's apparent adaptive deficits are related to significant sub-average general
intellectual functioning. Such evidence, even inasmuch as it may support a strong suspicion,
nevertheless falls short of evidence that could reasonably support a firm belief or conviction
that the applicant is mentally retarded. Even unchallenged by evidence from the State, the
applicant's proof, even if true, is insufficient reasonably to convince us that no rational
factfinder would fail to conclude he was mentally retarded to a level of confidence by clear
and convincing evidence.

E. Inadequate Resources


 In his brief and during the oral argument of this case, counsel for the applicant
complains that to require him to satisfy such a predicate level of confidence is too onerous
for the attorneys who are representing death-row inmates in the applicant's position. Both
counsel currently representing the applicant in this subsequent writ application are presently
court-appointed in federal court, but representing the indigent applicant in this proceeding
on a pro bono basis. (58) Article 11.071 does not provide for the appointment of counsel, or for
investigative or expert funding, for the preparation of subsequent writ applications, as it does
for preparation of an initial writ application. (59) Counsel assert that they are not in a financial
position to pay for the kind of full and thorough assessment that Dr. Patton has called for. 
Thus, they cannot fairly be expected to make the clear and convincing demonstration of
mental retardation that Article 11.071, Section 5(a)(3) requires as a predicate to proceeding
to the merits of the claim in a subsequent writ application.

 We are neither unmindful of, nor unsympathetic to, counsel's plight. An attorney who
is appointed for the first time to prepare a federal habeas corpus petition and in the course
of his investigation develops a good faith suspicion that his client may be mentally retarded
will indeed find himself in a dilemma if the initial state habeas attorney has not raised the
issue, and the record does not already contain (as it almost invariably will not) evidence
sufficient to satisfy the clear and convincing burden imposed by Article 11.071, Section
5(a)(3). We must point out, however, that the attorney who reasonably suspects that his
client might be actually innocent, or actually innocent of the death penalty (other than
because of mental retardation or juvenile status), will face the same dilemma, viz: how to
satisfy a steep burden of proof and persuasion without any resources allocated by the State
to help his indigent client. That is the hurdle the Legislature has deemed appropriate for the
subsequent applicant who has, for whatever reason, bypassed his opportunity to avail himself
of the resources to which he would have been entitled had he raised the issue in an initial writ
application, when it was factually and legally available to him.

 This means that pro bono subsequent writ counsel is put in the unfortunate position
of having to choose whether to personally bear the costs of expert and investigative
assistance, raise the costs himself from private charitable sources, file a writ application
without such assistance that will almost surely fall short of the statutory burden, or file no
writ application at all despite his good faith suspicions. This is a regrettable dilemma for any
attorney to have to face who is already giving generously and commendably of his own time. 
But it is one we are not at liberty to solve for him, in light of the legitimate legislative
judgment as expressed in the statute. Counsel for the applicant, and others similarly situated,
must present their dilemma for the consideration of the Legislature.

V. CONCLUSION


 In summary, we hold: 1) that whether the applicant can proceed with his subsequent
writ application depends upon whether he can satisfy the criteria of Article 11.071, Section
5(a)(3); 2) that an adequate threshold showing of mental retardation would meet the criteria
of that statutory provision; but 3) that the applicant in the instant case has failed to meet his
burden to present sufficient specific facts from which, even if true, we could reasonably
conclude, by clear and convincing evidence, that no rational factfinder would fail to find he
is mentally retarded. We therefore dismiss his subsequent writ application as an abuse of the
writ, as mandated by Article 11.071, Section 5(c).

Delivered: March 7, 2007

Publish
1. 536 U.S. 304 (2002).
2. Tex. Code Crim. Proc. art. 11.071, § 5(a)(1). That provision prohibits consideration of the
merits of a claim raised for the first time in a subsequent writ application unless the subsequent
application shows that the claim could not have been raised in a previous writ "because the factual
or legal basis for the claim was unavailable" at the time the applicant filed his previous writ or writs. 
We have allowed a number of subsequent capital habeas writ applications raising Atkins claims to
proceed under this provision when the applicant's initial writ application was filed before the
Supreme Court's Atkins opinion issued. See note 20, post. But it is obvious that both the factual and
legal bases for Blue's claim of mental retardation were extant at the time he filed his initial writ
application, so this provision does not apply in his case.
3. Tex. Code Crim. Proc. art. 11.071, § 5(a)(3).
4. Id.
5. 851 S.W.2d 275 (Tex. Crim. App. 1993).
6. Id. at 279-280.
7. Penry v. Lynaugh, 492 U.S. 302, 329-330 (1989). See also Bell v. Cockrell, 310 F.3d 330,
332 (5th Cir. 2002); Hill v. Anderson, 300 F.3d 679, 681 (6th Cir. 2002); In re: Holladay, 331 F.3d
1169, 1172-73 (11th Cir. 2003).
8. Penry, supra, at 329, quoting Teague v. Lane, 489 U.S. 288, 307 (1989).
9. Marin, supra, at 279.
10. Id. at 278; see also Rushing v. State, 85 S.W.3d 283, 285-86 (Tex. Crim. App. 2002).
11. Id. at 280 (emphasis added).
12. Pennsylvania v. Finley, 481 U.S. 551, 557 (1987); Murray v. Giarratano, 492 U.S. 1, 10
(1989) (plurality opinion); United States v. MacCollom, 426 U.S. 317, 323 (1976) (plurality
opinion). Cf. Case v. Nebraska, 381 U.S. 336 (1965) (petition for certiorari granted on issue of
whether federal constitution requires states to provide corrective post-conviction process to vindicate
federal constitutional rights, but issue essentially rendered moot when Nebraska Legislature enacted
legislation to provide same). 
13. Tex. Const. art. V, § 5.
14. See Acts 1995, 74th Leg., ch. 319, § 1, eff. Sept. 1, 1995.
15. 947 S.W.2d 216 (Tex. Crim. App. 1996).
16. A "successive" writ is a subsequent writ that raises issues already raised in an earlier writ
application. An "abusive" writ is a subsequent writ that raises issues that were available but not
raised in an earlier writ application. Schlup v. Delo, 513 U.S. 298, 318 n.34 (1995).
17. Tex. Const. art. I, § 12. See also Tex. Code Crim. Proc. art. 1.08.
18. Similarly, the United States Supreme Court has held that additional restrictions upon
successive or abusive writs imposed by Congress in the Antiterrorism and Effective Death Penalty
Act do not amount to a suspension of the writ in violation of Article I, Section 9 of the United States
Constitution. Felker v. Turpin, 518 U.S. 651, 664 (1996).
19. "We do not have the authority to judicially create a fourth exception to the statute." Ex parte
Graves, 70 S.W.3d 103, 115 (Tex. Crim. App. 2002).
20. See e.g., Ex parte Briseno, 135 S.W.3d 1, 3 (Tex. Crim. App. 2004) (where initial post-conviction writ of habeas corpus filed pre-Atkins, a subsequent writ was allowed to proceed "based
upon applicant's prima facie showing" of mental retardation); Ex parte Rodriguez, 164 S.W.3d 400
(Tex. Crim. App. 2005) (same); Ex parte Staley, 160 S.W.3d 56, 64 (Tex. Crim. App. 2005) ("[A]
death-row inmate may file a subsequent writ application based upon the newly available legal claim
of mental retardation under Atkins v. Virginia, but if his application states that his I.Q. has repeatedly
been tested at 120-130, he has failed to state sufficient specific facts establishing a cognizable claim
under Atkins."). Thus, subsequent applicants who can make the requisite threshold showing have
been able to rely upon Article 11.071, Section 5(a)(1) for authority to proceed on the merits.
21. This Court has shown that it can be flexible when it comes to judicial doctrines in order to
accommodate the constitutional prohibition against executing the mentally retarded. For example,
in Ex parte Soffar, 143 S.W.3d 804 (Tex. Crim. App. 2004), we modified our so-called "two-forums" rule in such a way that it should no longer pose a potential statute of limitations problem
for federal habeas applicants raising Atkins claims under the provisions of the Antiterrorism and
Effective Death Penalty Act. See In re Hearn, 376 F.3d 447 (5th Cir. 2004); In re Wilson, 442 F.3d
872 (5th Cir. 2006). But it is one thing to revise a judge-made rule, and quite another to revise a
statute. We are ordinarily loathe to "create" law, Ex parte Briseno, supra, at 4, and certainly may
not create law that overrides the legislative prerogative as expressed in statutory law, absent an
identifiable constitutional conflict. In Davis, we found no such conflict. Nor has the applicant 
identified any, other than the "absolute" nature of the bar against executing the mentally retarded.
Under these circumstances, "[w]e are not free to judicially disrupt the carefully crafted legislative
scheme." Ex parte Graves, supra, at 117.
22. Pub. L. No. 104-132, 110 Stat. 1214 (1996).
23. 28 U.S.C. § 2244(b)(2). The Fifth Circuit has allowed Atkins claims to proceed in
subsequent federal habeas petitions when the initial federal petition was filed pre-Atkins. In keeping
with 28 U.S.C. § 2244(b)(2)(A), the Fifth Circuit has recognized that such otherwise-abusive writs
may be brought so long as the petitioner can make a preliminary showing that the claim had not been
brought in a previous petition, that it relied upon a new rule of constitutional law made retroactive
to cases on collateral review by the Supreme Court (Atkins), and that the petitioner could produce
evidence to make out a prima facie case of mental retardation. See In re Henderson, 462 F.3d 413,
415 (5th Cir. 2006); In re Salazar, 443 F.3d 430, 431 (5th Cir. 2006); In re Hearn, 418 F.3d 444,
444-45 (5th Cir. 2005); In re Johnson, 334 F.3d 403, 404 (5th Cir. 2003); In re Morris, 328 F.3d
739, 740 (5th Cir. 2003). But we presume that, following the plain language of § 2244(b), the Fifth
Circuit would not permit an identical claim in a subsequent federal petition to proceed if the initial
petition was filed after Atkins. If the initial petition already alleged an Atkins claim, the subsequent
petition would be barred under § 2244(b)(1), which prohibits raising claims in a subsequent petition
that were alleged in a prior petition. If the initial petition failed to allege an Atkins claim, then such
a claim in a subsequent petition would be barred under § 2244(b)(2)(A), because the Atkins claim
was not "previously unavailable[.]" And, because § 2244(b)(2)(B) contains no provision comparable
to our own Article 11.071, Section 5(a)(3), the federal habeas petitioner would be unable to argue
that his Atkins claim is cognizable even in a subsequent petition on the basis that it renders him,
essentially, innocent of the death penalty.
24. See Felker, supra.
25. McCleskey v. Zant, 499 U.S. 467, 489 (1991); Felker, supra.
26. Id. at 493-96.
27. Ibid. The "cause" aspect of this threshold standard is codified for purposes of "abusive"
state habeas corpus writ applications in our Article 11.071, Sections 5(a)(1), (d), and (e).
28. Id. at 495. This "fundamental miscarriage of justice" condition for proceeding upon an
otherwise-abusive claim is mirrored in our Article 11.071, Subsections 5(a)(2) and (3).
29. See Murray v. Carrier, 477 U.S. 478, 495-96 (1986); McCleskey, supra, at 493-96. In
Schlup v. Delo, supra, at 327, the Supreme Court solidified the standard for proving "actual
innocence" in this context, holding that in order to proceed with a subsequent federal petition under
the "fundamental miscarriage of justice" exception, the petitioner must show "that it is more likely
than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."
30. See Smith v. Murray, 477 U.S. 527, 537-538 (1986); McCleskey, supra, at 493-96. In
Sawyer v. Whitley, 505 U.S. 333, 348 (1992), the Supreme Court defined the standard for proving
"actual innocence of the death penalty," holding that in order to proceed with a subsequent federal
petition raising a claim of error at the punishment phase of a capital trial, the petitioner must show
"by clear and convincing evidence that but for constitutional error, no reasonable juror would have
found him eligible for the death penalty under [state] law."
31. See Herrera v. Collins, 506 U.S. 390, 417-19 (1993); Schlup, supra, at 314-16; House v.
Bell, 126 S.Ct. 2064, 2086-87 (2006).
32. Herrera, supra, at 417; Schlup, supra, at 315-16; House, supra, at 2086-87.
33. In Schlup v. Delo, the Supreme Court justified the higher level of confidence required of a
showing of "actual innocence of the death penalty" (clear and convincing) than is required for a
showing of "actual innocence" (more likely than not), thus: "Claims of actual innocence pose less
of a threat to scarce judicial resources and to principles of finality and comity than do claims that
focus solely on the erroneous imposition of the death penalty." 513 U.S. at 324. It is possible that
the Supreme Court, were it to recognize a bare claim of "actual innocence of the death penalty,"
would find it appropriate to impose a burden on the petitioner even more "extraordinarily high" than
the petitioner who brings a bare claim of actual innocence.
34. Id. at 324-25.
35. Herrera, supra, at 417; Schlup, supra, at 315-16; House, supra, at 2086-87.
36. One federal circuit court of appeals has recently noted "grave constitutional concerns" in
the event that the statute of limitations enacted by the AEDPA were to operate to deny habeas corpus
access to an initial federal petitioner who had a claim of actual innocence but who missed his filing
deadline. See 28 U.S.C. § 2244(d). The Sixth Circuit held that, to avoid these concerns, it would
apply the court-made doctrine of equitable tolling, whereby the limitations requirement, which is not
considered jurisdictional anyway, would be ignored in any case in which the petitioner could meet
the Schlup test for actual innocence-that is to say, that it was more likely than not that no reasonable
juror would have convicted him. See Souter v. Jones, 395 F.3d 577 (6th Cir. 2005), and cases cited
at 601. Note, however, that the Sixth Circuit did not find these "grave constitutional concerns" to
justify equitable tolling in the absence of the substantial threshold showing of actual innocence that
is embodied in the Schlup standard. There is no suggestion that a bare and unsubstantiated claim of
actual innocence would suffice to equitably toll the federal statute of limitations. Thus, even if
"grave concerns" about the constitutionality of executing a state habeas applicant who was mentally
retarded meant that some provision must be made to allow him to raise it in a subsequent writ, even
if Article 11.071, Section 5 would not, we would still require him to satisfy a substantial threshold
burden of proof. The "grave constitutional concerns" recognized by the Sixth Circuit do not dictate
that we entertain an unsubstantiated claim of mental retardation in a subsequent writ application.


 Ultimately, even the applicant seems to acknowledge that some threshold proof of mental
retardation is appropriate, when he argues that "[i]n the face of an adequate threshold showing that
a petitioner is a person who is mentally retarded, the doctrine or application of waiver has no place
or purchase." Applicant's Brief, at 20.
37. See, respectively: Murray, supra, at 496; Coleman v. Thompson, 501 U.S. 722, 750 (1991);
Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992); McCleskey, supra, at 495.
38. Smith, supra, at 537-38; Sawyer, supra, at 348.
39. Sawyer, supra, at 343-48.
40. Cf. Ex parte Torres, 943 S.W.2d 469, 473 & n.3 (Tex. Crim. App. 1997) (observing that
legislative intent in adopting the comparable provisions of Article 11.07, § 4 of the Code of Criminal
Procedure, governing subsequent applications for non-capital post-conviction writs of habeas corpus,
and which was promulgated in the same legislative enactment as Article 11.071, Section 5, see Acts
1995, 74th Leg., ch. 319, §§ 1 & 5, eff. Sept. 1, 1995, was to adopt abuse-of-the-writ doctrine then
current in federal practice); Ex parte Kerr, 64 S.W.3d 414, 418 (Tex. Crim. App. 2002) (Habeas
Corpus Reform Act of 1995 adopted abuse-of-the-writ doctrine currently used in federal court) Our
examination of the legislative history of S.B. 440, through which Article 11.071 was originally
promulgated, provides no more specific insight than this into the intended scope of the exceptions
to the abuse of the writ doctrine as embodied in Section 5 .
41. Tex. Code Crim. Proc. art. 37.071, §§ 2(b) & (e).
42. 505 U.S. 333 (1992). We hesitate to declare that Article 11.071, Section 5(a)(3) wholly
codifies the Supreme Court's doctrine of "actual innocence of the death penalty," even inasmuch as
it has tied the exception to the bar on subsequent writs to the statutory criteria for the death penalty
under Article 37.071. Since 1991, one of the special issues that determine whether capital
punishment will be imposed is the so-called "mitigation" special issue, embodied in Article 37.071,
Section 2(e). See Acts 1991, 72nd Leg., ch. 838, § 1, eff. Sept. 1, 1991. Article 11.071 was originally
promulgated in 1995, after this amendment to Article 37.071. See Acts 1995, 74th Leg., ch 319, §
1, eff. Sept. 1, 1995. Therefore it is arguable that, in theory at least, a subsequent habeas applicant
could demonstrate by clear and convincing evidence that, but for some constitutional error, no
rational juror would have answered the mitigation special issue in the State's favor. On its face this
would seem to meet the criteria of Article 11.071, Section 5(a)(3). But it would also permit a
subsequent state habeas applicant to proceed under circumstances that would not excuse a federal
petitioner under Sawyer v. Whitley. We need express no ultimate opinion on this question here.
43. See Moore v. Quarterman, 454 F.3d 484, 498 (5th Cir. 2006) (Dennis, J., dissenting)
(defining innocence of the death penalty in terms of ineligibility for the death penalty "because some
constitutional or state statutory prerequisite for the imposition of a death sentence could not have
been satisfied.") (quoting Randy Hertz & James S. Liebman, Federal habeas Corpus Practice
and Procedure, § 26.4, at 1369-71 (5th ed. 2005)).
44. Roper v. Simmons, 543 U.S. 551 (2005).
45. Boykin v. State, 818 S.W.2d 782 (Tex. Crim. App. 1991) (in construing statutory language,
we give effect to plain meaning unless statutory language is ambiguous or would lead to absurd
results).
46. In Ex parte Elizondo, 947 S.W.2d 202, at 209 (Tex. Crim. App. 1996), we first articulated
the standard for a bare claim of actual innocence in post-conviction habeas proceedings. We held
that the applicant must show by clear and convincing evidence that no reasonable juror would have
convicted him in light of new evidence of innocence. Section 5(a)(3) of Article 11.071 modifies this
actual-innocence standard for purposes of applying it in the death penalty context by requiring the
applicant to show that "no rational juror would have answered in the state's favor one or more of the
special issues" set out in Article 37.071, Section 2(b). See Tex. Code Crim. Proc. art. 37.071, §
2(b). The Texas Legislature has not yet spoken to assign a burden of proof at trial in a capital case
on the issue of mental retardation. See Ex parte Briseno, supra, at 4-5. In the absence of any express
legislative guidance, we assume the burden would be placed upon the defendant to prove mental
retardation, rather than upon the State to discount it. That being the case, we think the proper way
to articulate a standard for actual innocence of the death penalty predicated on a claim of mental
retardation is as we have stated it in the text. That is to say, the applicant in a subsequent writ
application who wishes to clear the hurdle of Article 11.071, Section 5(a)(3) must demonstrate to
this Court that there is evidence that would be sufficient to show, to a level of confidence by clear
and convincing evidence, that no rational finder of fact would fail to find him mentally retarded.
47. Ex parte Briseno, supra, at 12.
48. Ibid.
49. Indeed, on its face, the statutory scheme does not even contemplate that the State should
respond to a subsequent writ, at least until this Court has authorized the applicant to go forward.
50. See Tex. Code Crim. Proc. art. 11.071, §§ 5(c) & 6(b). 
51. This is a reasonable construction of the language of the Section 5(a)(3), inasmuch as it
expressly requires "
sufficient specific facts" to establish mental retardation "by clear and convincing
evidence[.]" (Emphasis added.) As noted in the text, to construe the statutory language to require
that this Court actually be convinced by clear and convincing evidence at this juncture of the
proceedings would be inconsistent with the balance of the statutory scheme.
52. 135 S.W.3d at 7; Howard v. State, 153 S.W.3d 382, 386 (Tex. Crim. App. 2004).
53. The Fifth Circuit has found Dr. Patton to be a qualified expert for assessing and diagnosing
mental retardation. In re: Hearn, 418 F.3d 444, 445-46 (5th Cir. 2005). See also Ex parte Lewis, ___
S.W.3d ___ (Tex. Crim. App., No. WR-38,355-03, delivered December 6, 2006) (Cochran, J.,
concurring) (slip op. at 9) (expert witness regarding mental retardation "is not limited to one who
is a state-licensed physician or psychologist"); id. (Womack, J., dissenting) (Slip op. at 18).
54. All of these statements are signed, but none is notarized, all merely purporting to be "signed
under penalty or perjury . . .." Indeed, even Dr. Patton's "Declaration" is not notarized.
55. In Briseno we recognized that adaptive deficits are "determined by clinical assessment and,
usually, standardized scales." 135 S.W.3d at 7, n. 25. One such scale that has been identified in the
case law is the Vineland Adaptive Behavior Test. In re Henderson, 462 F.3d 413, 416 (5th Cir.
2006); In re: Salazar, 443 F.3d 430, 433-44 (5th Cir. 2006); United States v. Webster, 421 F.3d 308,
313 (5th Cir. 2005). See American Psychiatric Association Diagnostic and Statistical
Manual of Mental Disorders (Text Revision, 4th ed. 2000), at 42. The applicant neither tenders
any such test results, nor offers any explanation why he does not, aside from a general complaint
about a lack of resources provided under the statute for subsequent applicants in preparing their writ
applications - a complaint we address post.
56. Dickerson's declaration, like most of the others, is not notarized.
57. See In re: Salazar, supra, at 433 ("This theory attributes the general rise of I.Q. scores of a
population over time to the use of outdated testing procedures, emphasizing the need for the repeated
renormalization of I.Q.-test standard deviations over time.")
58. The Fifth Circuit has held that federal habeas counsel are not entitled to federal funds,
pursuant to 21 U.S.C. § 848(q)(9), for expert and investigative assistance to pursue unexhausted
claims for purposes of raising those claims in subsequent state post-conviction habeas corpus
proceedings. In re: Joiner, 58 F.3d 143 (5th Cir. 1995); Sterling v. Scott, 57 F.3d 451 (5th Cir. 1995). 
See also Riley v. Dretke, 362 F.3d 302, 307-308 (5th Cir. 2004) (federal petitioner was not entitled
to federal funds to develop unexhausted evidence of mental retardation in support of ineffective
assistance of counsel claim).
59. Tex. Code Crim. Proc. art. 11.071, §§ 2A & 3.