United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 17, 2006**

Charles R. Fulbruge III
Clerk

REVISED JUNE 2, 2006

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

---

No. 06-10243

---

In re: Robert Madrid Salazar

---

Movant,

---

On Motion for Authorization to File
Successive Petition for Writ of Habeas
Corpus in the United States District Court
Before the Northern District of Texas, Lubbock

---

Before KING, DeMOSS, and STEWART, Circuit Judges.

PER CURIAM:

In March 1999, death-row inmate Robert Madrid Salazar was convicted of capital murder for the 1997 beating death and sexual assault of his girlfriend's two-year-old daughter. Having exhausted his initial state and federal habeas claims, Salazar faces execution, scheduled for March 22, 2006.

On February 14, 2006, Salazar filed a subsequent state application for writ of habeas corpus with the Texas Court of Criminal Appeals based on Atkins v. Virginia, 536 U.S. 304 (2002), which categorically bars the execution of mentally retarded persons. The Texas Court of Criminal Appeals dismissed his application as an abuse of the writ, rejecting Salazar's assertion that he is mentally retarded and therefore exempt from

execution under <u>Atkins</u>.  <u>Ex parte Salazar</u>, No. WR-49,210-02 (Tex. Crim. App. Mar. 9, 2006) (per curiam).

Salazar, maintaining that he is mentally retarded, now moves in this court pursuant to 28 U.S.C. § 2244(b)(3)(A) for authorization to file a successive application for writ of habeas corpus with the United States District Court based on the new constitutional rule announced in <u>Atkins</u>.  Salazar also moves for a stay of execution.  Because we hold that Salazar has failed to establish a prima facie case of mental retardation, we DENY his motions.

## I. THE AEDPA STANDARD FOR AUTHORIZING THE FILING OF A SUCCESSIVE APPLICATION FOR WRIT OF HABEAS CORPUS IN THE DISTRICT COURT

The Antiterrorism and Effective Death Penalty Act ("AEDPA") strictly limits the ability of federal habeas applicants to file successive applications for writ of habeas corpus in federal court, directing courts to dismiss any claim presented in a successive application unless, inter alia, "the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."  28 U.S.C. § 2244(b)(2)(A).  An applicant wishing to file a successive federal habeas application with a district court must first "move in the appropriate court of appeals for an order authorizing the district court to consider the application."  <u>Id.</u> § 2244(b)(3)(A).  Under this statutory scheme, this court serves a "gatekeeping" function,

-2-

Felker v. Turpin, 518 U.S. 651, 657 (1996), and "may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of" § 2244(b). 28 U.S.C. § 2244(b)(3)(C). A prima facie showing is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." In re Morris, 328 F.3d 739, 740 (5th Cir. 2003) (quoting Bennett v. United States, 119 F.3d 468, 469 (7th Cir. 1997)).

Because Salazar bases his application on the new constitutional rule announced in Atkins, to obtain authorization to file a successive claim, he must make a prima facie showing that "(1) his claim has not previously been presented in a prior application to this court, (2) his claim relies on a decision that stated a new, retroactively applicable rule of constitutional law that was previously unavailable to him, and (3) . . . he is mentally retarded." In re Hearn, 418 F.3d 444, 444-45 (5th Cir. 2005). Because Salazar has met the first two requirements of his prima facie case--i.e., that his claim has not previously been presented before this court and that his claim relies on a new, retroactively applicable rule of constitutional law not available to him when he filed his initial habeas application--we must determine only whether he has made a prima facie case of mental retardation.

## II. PRIMA FACIE CASE OF MENTAL RETARDATION

While the Supreme Court in <u>Atkins</u> categorically barred the execution of mentally retarded persons, it declined to announce a uniform definition of mental retardation, noting that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." 536 U.S. at 317. The Court therefore left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences," <u>id.</u>, but cited with approval the American Association on Mental Retardation ("AAMR") definition of mental retardation. <u>Id.</u> at 309 n.3.

Since the <u>Atkins</u> decision, Texas courts addressing <u>Atkins</u> claims have followed the definition of mental retardation adopted by the AAMR and the almost identical definition contained in section 591.003(13) of the Texas Health & Safety Code. Under this standard, an applicant claiming mental retardation must show that he suffers from a disability characterized by "(1) 'significantly subaverage' general intellectual functioning," usually defined as an I.Q. of about 70 or below; "(2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." <u>Ex parte Briseno</u>, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004); <u>see also</u> TEX. HEALTH & SAFETY CODE § 591.003(13) (Vernon 2003) (defining "mental retardation"

as "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period"); Morris v. Dretke, 413 F.3d 484, 490 (5th Cir. 2005) (applying the AAMR standard adopted in Briseno to a federal habeas claim based on Atkins). To state a successful claim, an applicant must satisfy all three prongs of this test. See Hall v. Texas, 160 S.W.3d 24, 36 (Tex. Crim. App. 2004) (en banc).

We are convinced that Salazar's Atkins claim does not have sufficient possible merit to warrant further exploration by the district court. Salazar offers no affirmative evidence tending to show that he suffers from significantly subaverage general intellectual functioning or that any such intellectual functioning has been accompanied by related limitations in adaptive functioning. Specifically, he provides no proof in the form of test scores, school records, doctor reports, affidavits from teachers or family members, or any similar documentation indicating that he has ever been suspected of being mentally retarded, diagnosed with any other disability, or placed in a special needs program. In fact, the only two professionals ever personally to evaluate Salazar have concluded that he is not mentally retarded, and his scores on two separate I.Q. tests are above the cutoff for mental retardation, which Texas recognizes as a score of 70 or below. See Briseno, 135 S.W.3d at 7 n.24 (noting that "[s]ignificantly subaverage intellectual functioning

is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean)").

In 1978, Salazar, who was eight years old at the time, scored a 102 on a Slosson Intelligence Test administered by Dr. Michael Ratheal. Dr. Ratheal, who administered several other tests to Salazar and performed a lengthy psychological evaluation, noted that Salazar's I.Q. score "suggests functioning in the Average range of intelligence." Ratheal Report at 2. Although Salazar did receive low scores on the Vineland Adaptive Behavior test administered during the same session, Dr. Ratheal noted that the "scores indicate extremely low functioning in the areas of adaptive behavior, especially in consideration of Robert's average intellectual ability." Ratheal Report at 5. Based on the totality of her examination, Dr. Ratheal did not conclude that Salazar was mentally retarded. Moreover, in 1999, while Salazar was twenty years old and awaiting trial for capital murder, he scored an 87 on the WAIS-R intelligence test administered by Dr. Antolin Llorente, who spent two days examining Salazar and administering a total of twenty-five tests. Like Dr. Ratheal, Dr. Llorente did not conclude that Salazar was mentally retarded based on his examination, noting in his report that Salazar's scores indicated that Salazar was "currently functioning within the upper end of the Low Average to low end of the Average range of intelligence." Llorente Report at 5.

Attempting to cast doubt on the reliability of these

assessments, Salazar offers the lone statement of Dr. Richard Garnett, a frequent expert witness in Texas capital cases who has experience in diagnosing and working with people with mental retardation.  Dr. Garnett, who reviewed Salazar's medical records and I.Q. scores at the request of Salazar's attorney, asserts that the Slosson Test "should not be considered a valid indicator of Mr. Salazar's intellectual functioning" and that the test results "must be followed by a more formal and in-depth evaluation and diagnosis."  Garnett Report at 3.  However, Dr. Garnett fails to note in his analysis that, in addition to administering the Slosson Test, Dr. Ratheal did perform an in-depth evaluation of Salazar, and her nine-page psychological evaluation report never suggested that Salazar might be mentally retarded, instead describing him as "a bright youngster" and "functioning in an average range of intellectual ability." Ratheal Report at 6.

Dr. Garnett also posits that Salazar's later score of 87 on the WAIS-R test might have been artificially inflated because of a phenomenon called the "Flynn Effect."  This theory attributes the general rise of I.Q. scores of a population over time to the use of outdated testing procedures, emphasizing the need for the repeated renormalization of I.Q.-test standard deviations over time.  Although Dr. Garnett describes the effect of this phenomenon on the average I.Q. score in the general population, he does not indicate what effect it would have had on Salazar's

-7-

score in particular or even whether it is appropriate to adjust an individual's score based on this theory.[1]

Finally, Dr. Garnett emphasizes that Salazar scored poorly on the Vineland Adaptive Behavior Test administered by Dr. Ratheal and that these scores could be indicative of mental retardation. Although this fact, standing alone, might be troubling, the definition for mental retardation adopted by the AAMR and by the state of Texas requires us to consider the data in context. Thus, Dr. Ratheal's note that Salazar's adaptive behavior "scores indicate extremely low functioning in the areas of adaptive behavior, <u>especially in consideration of Robert's average intellectual ability</u>" indicates that, while Salazar might have suffered from limitations in adaptive behavior as a child,

---

[1] Even assuming that the Flynn Effect is a valid scientific theory and is applicable to Salazar's individual I.Q. score--and we express no opinion as to whether this is actually the case--Salazar's score readjusted to account for score inflation is still above the cutoff for mental retardation. Dr. Garnett explains that, under the Flynn Effect theory, the passage of time has inflated test scores by approximately one-third to two-thirds of a point per year since the normalization of the particular test in question. Therefore,

> one can establish a range of estimated score inflation by taking the number of years that has [sic] passed since the standardization norms were established and the date of test admission, and then multiply .3 and .6 to get the range of inflation. Those amounts are subtracted from the IQ score to obtain the range of effect.

Garnett Report at 5. Salazar took his WAIS-R test in 1999, twenty-one years after it was normalized; thus, using the above equation, his readjusted score would range from 80.7 to 74.4, both of which are above the cutoff score of 70.

-8-

it was not accompanied by the significantly subaverage general intellectual functioning required under the definition. Ratheal Report at 5 (emphasis added); see TEX. HEALTH & SAFETY CODE § 591.003(13) (defining mental retardation as subaverage general intellectual functioning that is "concurrent with" deficits in adaptive behavior); Hall, 160 S.W.3d at 36 (requiring that all three prongs of the definition be satisfied for a successful claim of mental retardation).

In short, no professional who has ever personally evaluated Salazar has labeled him mentally retarded, and Salazar offers no support for his claim other than the statement of Dr. Garnett, who never personally evaluated or tested Salazar. Dr. Garnett's statement, without more, "is simply insufficient to suggest that further development of [Salazar's] claim has any likelihood of success under the Atkins criteria." In re Johnson, 334 F.3d 403, 404 (5th Cir. 2003) (denying a motion for authorization to file a successive habeas application based on Atkins where the applicant offered only two letters from psychologists and a seventh-grade transcript showing poor grades); In re Campbell, 82 F. App'x 349, 350 (5th Cir. 2003) (denying a motion for authorization where the applicant did not provide any evidence of mental impairment or cognitive dysfunction). Because Salazar has failed to state a prima facie case of mental retardation, we cannot grant his motion for authorization to file a successive habeas application

in district court.[2]

### III. CONCLUSION

For the foregoing reasons, we DENY Salazar's motion for authorization to file a successive habeas application based on Atkins. His motion for a stay of execution is also DENIED.

---

[2] We also note that, even if we were to grant Salazar's motion for authorization to file a successive habeas application, his application would be time barred in district court under the AEDPA one-year limitations provision unless equitable tolling were deemed appropriate. See 28 U.S.C. § 2244(d)(1)(C) (limiting the period for filing a successive habeas application based on a new rule of retroactively applicable constitutional law to one year from "the date on which the constitutional right asserted was initially recognized by the Supreme Court"). The Supreme Court issued its decision in Atkins on June 20, 2002; therefore, the AEDPA limitations period expired on June 20, 2003, more than two and a half years ago. See In re Hearn, 376 F.3d 447, 456 n.11 (5th Cir. 2004).

The state urges us to deny Salazar's motion solely on the ground that the successive application would be time barred under § 2244(d)(1)(C) without addressing whether Salazar has made a sufficient prima facie showing as required for authorization under 28 U.S.C. § 2244(b)(3)(C). However, we need not make this determination--or answer the open question of whether, in our role as "gatekeeper" under § 2244(b)(3)(C), we have the statutory authority to deny a motion for authorization solely on the basis of timeliness under § 2244(d)(1)(C)--because we hold that Salazar has failed to make a prima facie showing that the application satisfies the requirements of § 2244(b). Cf. In re Wilson, --- F.3d ----, 2006 WL 574273 (5th Cir.) (granting a motion for authorization to file a successive habeas application based on Atkins after holding that the applicant had made a prima facie case of mental retardation and determining that equitable tolling would apply to save his application from being untimely in the district court under § 2244(d)(1)(C)); In re Elizalde, No. 06-20072 (5th Cir. Jan. 31, 2006) (denying a similar motion on the ground that the applicant had failed to establish a prima facie case of mental retardation and also noting in dicta that his application would likely be time barred in district court).