IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 15, 2007

Charles R. Fulbruge III
Clerk

No. 07-70010

REGINALD PERKINS

Petitioner - Appellant

v.

NATHANIEL QUARTERMAN, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas, Fort Worth
USDC No. 4:06-CV-687-A

Before KING, HIGGINBOTHAM, and GARZA, Circuit Judges.

PER CURIAM:[*]

Petitioner Reginald Perkins, a Texas death row inmate, requests a certificate of appealability to appeal the district court's denial of his petition for a writ of habeas corpus. For the following reasons, this request is DENIED.

I. BACKGROUND

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Reginald Perkins was convicted of capital murder and sentenced to death for the December 4, 2000, strangulation death of his stepmother, Gertie Perkins. A full account of the underlying facts can be found in the district court's opinion, Perkins v. Quarterman, No. 4:06-CV-687-A (N.D. Tex. Mar. 1, 2007). We have included the facts relevant to each of Perkins's claims on appeal in our discussion below. The Texas Court of Criminal Appeals affirmed Perkins's conviction and sentence on direct appeal, Perkins v. State, No. 74,318 (Tex. Crim. App. June 30, 2004) (unpublished), and the Supreme Court denied certiorari, Perkins v. Texas, 543 U.S. 1164 (2005). Perkins also filed a state petition for habeas corpus. The state trial court held lengthy evidentiary hearings (generating six volumes of transcript and one volume of exhibits), adopted findings of fact and conclusions of law, and recommended that the petition be denied. The Texas Court of Criminal Appeals adopted the trial court's findings and denied relief. Ex parte Perkins, No. WR-64,354-01 (Tex. Crim. App. Sept. 13, 2006). Perkins next filed a federal habeas petition in the Northern District of Texas, alleging seven grounds for relief. The district court denied all relief, and denied a certificate of appealability (COA) on all claims. Perkins now requests a COA for an Atkins claim, two ineffective assistance of counsel claims, a constitutional challenge to the Texas sentencing statute, and an actual innocence claim.

## II. STANDARD OF REVIEW

Perkins's federal habeas petition was filed in 2006, so it is subject to the requirements of the Antiterrorism and Effective Death Penalty Act (AEDPA). See Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under AEDPA, a petitioner must obtain a COA in order to appeal the denial of his petition in district court. 28 U.S.C. § 2253(c)(1). Because the district court denied Perkins's application for a COA, he now requests one from this court. See id.

We may issue a COA only if a petitioner makes "a substantial showing of the denial of a constitutional right." Id. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). The COA determination is a "threshold inquiry" that consists of "an overview of the claims in the habeas petition and a general assessment of their merits," but "does not require full consideration of the factual or legal bases adduced in support of the claims." Id. at 336. "While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." Johnson v. Quarterman, 483 F.3d 278, 285 (5th Cir. 2007) (citing Ramirez v. Dretke, 398 F.3d 691, 694 (5th Cir. 2005)).

We also recognize that the district court evaluated Perkins's claims under AEDPA's deferential framework. Under AEDPA, habeas relief may not be granted on any claim adjudicated on the merits in state court unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d). In addition, "a determination of a factual issue made by [the] State court shall be presumed to be correct" unless rebutted by clear and convincing evidence. Id. § 2254(e)(1).

## III. DISCUSSION

Perkins now requests a COA on five issues: (1) whether his death sentence is barred by the Eighth Amendment because he is mentally retarded; (2) whether trial counsel rendered ineffective assistance by failing to investigate

3

and present evidence that he is mentally retarded; (3) whether trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence at the punishment phase of his trial; (4) whether the Texas sentencing scheme unconstitutionally places the burden of proof for mitigation on the criminal defendant; and (5) whether his death sentence is unconstitutional because he is actually innocent. We address each issue in turn.

## A.    Mental Retardation

The state court found that Perkins is not mentally retarded. The district court concluded that this decision was not unreasonable, and that Perkins had failed to controvert the state court's finding with clear and convincing evidence. We must now determine if reasonable jurists would disagree with this conclusion.

The Supreme Court's decision in Atkins v. Virginia barred the execution of mentally retarded persons, but left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction." 536 U.S. 304, 317 (2002). Texas courts have responded to Atkins by requiring a person claiming to be mentally retarded to "show that he suffers from a disability characterized by (1) significantly subaverage general intellectual functioning, usually defined as an I.Q. of about 70 or below; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." In re Salazar, 443 F.3d 430, 432 (5th Cir. 2006) (citing Ex parte Briseno, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004)) (internal quotation marks omitted).

With regard to the first element, three IQ tests were administered in connection with the state court proceedings, with Perkins's scores ranging from 66 to 80. In September 2003, Perkins scored a 68 on the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III). The state habeas court found this result unreliable, though, because Perkins took the test immediately after undergoing an upsetting psychological evaluation. At the state evidentiary

hearings, the doctor who administered the evaluation and IQ test stated that, in hindsight, it would have been preferable to administer the IQ test first, when Perkins was "fresher" and not burdened with "emotionally loaded information." This doctor had initially believed Perkins to be mentally retarded, but testified that he was "uncertain" and "no longer willing to state with a reasonable degree of psychological certainty" that Perkins is mentally retarded. In June 2004, Perkins took the WAIS-III again, without being interviewed beforehand, and scored an 80. The doctor who administered this test believed it represented Perkins's true ability, and that the earlier score of 68 was probably due to "emotional interference."

Nonetheless, in the face of the two conflicting scores on the WAIS-III, the state court suggested that a third evaluation be performed, and in May 2005 Perkins scored a 66 on a different IQ test, the Stanford-Binet V. However, in the second part of the state evidentiary hearing (which was postponed for fifteen months to allow for the third test), the doctor who administered this test stated "with a high degree of certainty" that the result was not valid because Perkins did not give full effort. He compared Perkins's results to the results of a group "who were asked to deliberately feign cognitive problems," and concluded that Perkins satisfied the criteria for "probable malingering." The state court discounted the result from the Stanford-Binet test because of the lack of full effort and incentive to malinger on Perkins's part. It found that the second test, in which Perkins scored an 80, was a reliable and accurate measure of Perkins's IQ.

On the second element, Perkins's doctor testified that it is difficult to measure adaptive functioning in a person, like Perkins, who has been institutionalized for a substantial period of time. However, anecdotal reports of Perkins's family, an academic skills test, and Perkins's self-reporting were said to show evidence of adaptive behavior deficits. The record from the state habeas

proceedings shows that Perkins had obtained a commercial driver's licence, been employed as a truck driver, completed numerous prison classes while previously incarcerated, and scored well in prison job and school evaluations. He had the ability to read maps and follow directions, write checks, drive a nine-speed manual transmission truck, calculate his pay based on a percentage of his employer's receipts, and play chess. The state also called attention to the circumstances of the crime, which Perkins took steps to conceal by creating an alibi and attempting to cast the blame on another. From this evidence, the state court concluded that Perkins did not have adaptive behavior deficits linked to deficits in intellectual functioning.

Finally, there was little evidence in support of the third element, onset before the age of 18. Perkins contends that it would be unrealistic to expect him to produce detailed records on this element because he was raised by a family of minimal education in rural Arkansas and attended segregated schools, but the state court found no onset before the age of 18.

The district court determined that the state court's finding that Perkins is not mentally retarded was not unreasonable and had not been controverted by clear and convincing evidence. Particularly in light of the state trial court's lengthy habeas hearings and detailed findings of fact and conclusions of law, we do not believe that reasonable jurists would find this decision debatable. The crux of the matter is that not one of the three psychologists who evaluated Perkins was willing to definitively label him mentally retarded. We deny a COA on this issue.

B.    Ineffective Assistance of Counsel — Mental Retardation

Perkins also claims that his trial counsel rendered ineffective assistance by failing to investigate or present evidence of his alleged mental retardation. This claim is governed by the familiar standard of Strickland v. Washington, 466 U.S. 668 (1984). To prevail, Perkins must show that his counsel rendered

deficient performance, and that his defense was prejudiced by the deficiency. Id. at 687. The district court reasoned that even if trial counsel had been deficient, Perkins could not satisfy Strickland's prejudice prong because he is not in fact mentally retarded. In light of the above discussion of Perkins's Atkins claim, we do not believe this conclusion is debatable. To the extent Perkins also argues that evidence of limited intelligence, though not amounting to mental retardation, might still have been presented as a mitigating factor at sentencing, we likewise believe debate on the district court's decision to be foreclosed, for the reasons we discuss in our consideration of Perkins's next claim.

## C.    Ineffective Assistance of Counsel — Mitigating Evidence

Perkins next seeks a COA to appeal the district court's denial of his claim that trial counsel rendered ineffective assistance by failing to investigate or present mitigating evidence at sentencing. The district court agreed with the state court's conclusion that counsel's performance was reasonable. The district court also concluded that Perkins could not show prejudice as required by Strickland.

At Perkins's sentencing hearing, the prosecution first established that in 1980, Perkins pled guilty to rape, attempted rape, and gross sexual imposition, charges that arose out of sexual assaults on two twelve-year-old girls in Ohio. The state also introduced evidence linking Perkins to the strangulation murders of two other women in Ohio. One of these women was the mother of one of the twelve-year-old girls Perkins had raped. Perkins allegedly had warned this girl that if she told anybody what had happened, he would kill whoever she told; her mother found out about the rape and was murdered shortly thereafter. The second woman was the pregnant twin sister of Perkins's girlfriend. The state also contrasted the kindness and affection shown to Perkins by his stepmother—she wrote him letters in prison, loaned him money, arranged for a job after he was paroled, and generally treated him like a son—with the

7

circumstances of the crime—he clubbed and strangled her in her own house, stashed her body in the trunk of her car, and then pawned her wedding ring.

The defense's strategy at sentencing was to convince the jury that Perkins would not be a future danger in prison.[1] Through an expert witness, the defense showed a videotape detailing the structured, ordered nature of Texas prisons, and argued that Perkins was a low risk for violence in such an environment. Perkins's then-current jailor testified that he was not a disciplinary problem while in custody. A forensic psychologist, who had examined Perkins's prior prison records as well as general statistical studies of prison violence, used actuarial methods to conclude that there was an 85 to 90 percent likelihood that Perkins would not commit an act of serious violence in prison. He also emphasized that Perkins's age at the time of the trial (47) and relatively non-violent prior prison record were factors that reduced the risk that he would engage in violent behavior. The defense also called fact witnesses in an attempt to cast doubt on the state's evidence of Perkins's extraneous offenses.

The state court found trial counsel's decision to focus on the future dangerousness issue at sentencing to be a reasonable trial strategy. In evaluating decisions such as this one, the Supreme Court distinguishes between "strategic choices made after thorough investigation of law and facts relevant to the plausible options" and "strategic choices made after less than complete investigation": the former "are virtually unchallengeable," while the latter "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690–91. The primary focus, then, is "not whether counsel should have presented a mitigation case," but "whether the investigation supporting counsel's decision not to

---

[1] Under Texas law, a defendant is eligible for the death penalty only if the jury unanimously finds that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071, § 2(b).

introduce mitigation evidence . . . was itself reasonable." Wiggins v. Smith, 539 U.S. 510, 522–23 (2003) (emphasis in original).

The reasonableness of an investigation into a capital defendant's background has been at issue in three recent Supreme Court cases. In Williams v. Taylor, the Court determined that trial counsel's failure to present mitigating evidence could not be justified as a strategic choice, because counsel "did not fulfill their obligation to conduct a thorough investigation of the defendant's background." 529 U.S. 362, 396 (2000). Counsel in that case failed to obtain records chronicling Williams's "nightmarish childhood" because counsel incorrectly believed that state law barred access to the records. Id. at 395. Counsel also failed to seek prison records or obtain the testimony of prison officials who described Williams as "least likely to act in a violent, dangerous or provocative way." Id. at 396.

In Wiggins v. Smith, the Court determined that trial counsel conducted an unreasonably limited investigation before deciding not to present a mitigation case. 539 U.S. at 523–24. There, counsel consulted only two sources revealing anything about the defendant's "life history": a one-page pre-sentence investigation report prepared by the parole and probation office, and city social services records. Id. Because of this limited investigation, counsel failed to uncover "evidence of severe physical and sexual abuse." Id. at 516.

Finally, in Rompilla v. Beard, the Court held that even when the defendant and his family members suggest no mitigating evidence is available, his lawyer is bound to obtain and review material that counsel knows the prosecution plans to rely on at sentencing. 545 U.S. 374, 377 (2005). The Court found prejudice in Rompilla's case because a review of that material, a prior conviction file, "would have destroyed the benign conception of Rompilla's upbringing and mental capacity . . . formed from talking with Rompilla himself

and some of his family members" and alerted counsel that further investigation was necessary.  Id. at 391.

With these precedents in mind, we make a "threshold inquiry" into Perkins's claim that counsel's investigation was inadequate.  The record of the state habeas proceedings (including the hearings, which thoroughly explored this claim) shows that trial counsel began by asking Perkins to give an account of his life, including information regarding his childhood and any abuse or other traumatic experiences he suffered.  In a written statement, Perkins recounted that his mother whipped her children with extension cords, mop handles, broom sticks, a belt, or "whatever she got her hands on."  At age thirteen, Perkins moved to Texas with his father, who also whipped him with a belt or extension cord in a similar manner.  However, Perkins characterized these whippings as a form of discipline, stating that, "I was young, and they only wanted me to make something out of my life."

In addition, the defense obtained copies of Perkins's Ohio prison records, which, since Perkins had been incarcerated in Ohio for a large portion of his adult life, were extensive.  These records included psychological and medical reports, prison education records, prison job evaluations, and Perkins's own writings.  Where these records touched on Perkins's background and family history, they largely confirmed what he had revealed in his written statement.

Trial counsel also employed a private investigator who traveled to Cleveland and met with five members of Perkins's family.  The investigator learned that Perkins's mother was in the habit of using switches and extension cords to whip her children.  However, the family members indicated that they did not consider the mother abusive, but merely "very strict."  They called her the "best of the best," who "was always there for each of the kids."  The investigator did not interview the mother, who by that time was in a nursing home suffering from dementia.  After the Cleveland meeting, the investigator

kept in touch with the family by phone, and several family members traveled from Cleveland to Fort Worth for Perkins's trial, where they periodically met with trial counsel and the investigator.

After obtaining trial counsel's file, receiving affidavits from counsel and Perkins's family, and hearing testimony from counsel, the investigator, a mitigation specialist, and Perkins's family at the evidentiary hearing, the state habeas court concluded that counsel's investigation was not deficient. Perkins argues that the investigation was nonetheless inadequate because it failed to uncover a large quantity of potentially mitigating evidence about his background, which was presented by the family for the first time in the state habeas proceeding.[2] However, the state court found that the affidavits and testimony relating this evidence were not credible and were inconsistent with the information originally given to the investigator.

In light of the investigation conducted, the state court found that counsel's decision to argue and present evidence on the lack of future dangerousness (as distinguished from evidence about Perkins's difficult childhood) was reasonable. Counsel knew that Perkins's childhood was less than ideal, but did not believe this fact would be particularly effective as a mitigating factor in light of Perkins's prior criminal history and age at the time of the murder (45). The district court essentially agreed with the state court's conclusion that counsel's performance was reasonable, and we do not believe this decision is debatable. Accordingly, we need not consider the district court's determination that Perkins failed to demonstrate prejudice under Strickland's second prong. We deny a COA on this issue.

---

[2] This evidence provided a much darker account of Perkins's childhood; for example, Perkins's sister stated that (1) Perkins's mother tried to abort him with a coat hanger and by drinking castor oil and bleach; (2) Perkins witnessed weekly, violent fights between his mother and her common-law husband, who both drank heavily; (3) Perkins's mother prostituted herself to a neighbor so that Perkins and his brother could steal firewood from the neighbor; and (4) Perkins and his siblings were neglected and emotionally abused by their mother.

D.    The Texas Sentencing Statute

Perkins next relies on Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), to argue that the Texas sentencing statute is unconstitutional because it does not place the burden on the State of proving beyond a reasonable doubt that there are no mitigating circumstances sufficient to warrant the imposition of a life sentence rather than a death sentence. But as Perkins recognizes, this circuit has rejected the argument that Apprendi and Ring require the state to prove beyond a reasonable doubt the absence of mitigating circumstances. See Granados v. Quarterman, 455 F.3d 529, 536–37 (5th Cir. 2006); Rowell v. Dretke, 398 F.3d 370, 378 (5th Cir. 2005). The district court's denial of this claim is therefore not debatable, and we deny a COA on this issue.

E.    Actual Innocence

Finally, Perkins argues that he is actually innocent of the capital murder for which he was convicted, and offers his own affidavit in support. He also speculates that a jailhouse snitch who testified against him might have had his charges reduced in exchange for testimony. The district court denied relief on this claim.

Since Perkins has not asserted actual innocence as a "gateway" to obtain review of an otherwise barred claim, see Dowthitt v. Johnson, 230 F.3d 733, 741 (5th Cir. 2000), the only question is whether a stand-alone claim of actual innocence is cognizable in a federal habeas petition. In Herrera v. Collins, the Supreme Court assumed, for the sake of argument, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. 390, 417 (1993). Whether such stand-alone claims of actual innocence claims are in fact possible is a question the Supreme Court has "decline[d] to resolve," House v.

Bell, 126 S. Ct. 2064, 2087 (2006), but this circuit has not read Herrera as allowing such claims. See Foster v. Quarterman, 466 F.3d 359, 367–68 (5th Cir. 2006); Dowthitt, 230 F.3d at 741–42. The district court's denial of this claim is therefore not debatable, and we deny a COA on this issue.

## IV. CONCLUSION

Perkins's request for a COA is DENIED.