# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 9, 2010

No. 10-70009

Lyle W. Cayce
Clerk

GUADALUPE ESPARZA

Petitioner-Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:07-CV-265

Before BENAVIDES, PRADO, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Petitioner Guadalupe Esparza ("Esparza"), convicted of capital murder in
Texas and sentenced to death, requests this Court to issue a Certificate of
Appealability (COA) pursuant to 28 U.S.C. § 2253(c)(2).  Esparza contends that
the evidence demonstrated that he is mentally retarded, rendering him ineligible
for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002).  Relying on
the Sixth Amendment, Esparza asserts that he is entitled to a jury finding with

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 10-70009

respect to the issue of mental retardation.  He also contends that his counsel rendered ineffective assistance by failing to investigate his mental retardation and present evidence of his mental retardation at sentencing.  Finding that Esparza has not made a substantial showing of the denial of a constitutional right, we DENY a COA.

## I.   PROCEDURAL HISTORY

A Bexar County, Texas grand jury returned an indictment charging Esparza with the capital murder of 7-year old Alyssa Vasquez while in the course of committing aggravated sexual assault, kidnapping, and burglary. TEX. PENAL CODE § 19.03(a)(2).  A jury convicted Esparza as charged, and the sentence imposed was the death penalty.  The Texas Court of Criminal Appeals affirmed Esparza's conviction in an unpublished opinion. *Esparza v. State,* No. 74,096 (Tex. Crim. App. June 4, 2003), *cert. denied*, 540 U.S. 1006 (2003). Represented by counsel, Esparza applied for state habeas relief, and the trial court recommended denying relief.  Additionally, Esparza filed a separate application for writ of habeas corpus pro se. With respect to the first application, the Court of Criminal Appeals adopted the findings and conclusions of the trial court and denied the application. *Ex parte Esparza*, Nos. WR-66111-01, WR-66111-02 (Tex. Crim. App. Feb. 28, 2007).  The Court of Criminal Appeals also dismissed the pro se application as an abuse of the writ.  Esparza then filed a federal petition for writ of habeas corpus, which the district court denied in a memorandum opinion and order. *Esparza v. Quarterman*, No. 07-265 (W.D. Tex. Mar. 24, 2010).  The district court also denied a COA.  Esparza now requests a COA from this Court.

## II.   STANDARD OF REVIEW

Esparza filed his 28 U.S.C. § 2254 petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA). The petition, therefore, is subject to AEDPA.  *See Lindh v. Murphy*, 521 U.S.

2

320, 336 (1997). Pursuant to the federal habeas statute, as amended by AEDPA, we defer to a state court's adjudication of a petitioner's claims on the merits unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 404–08 (2000). A state court's decision constitutes an unreasonable application of clearly established federal law if it is "objectively unreasonable." *Id*. at 409. Further, pursuant to § 2254(e)(1), state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001).

Additionally, under AEDPA, a petitioner must obtain a COA before he can appeal the district court's denial of habeas relief. *See* 28 U.S.C. § 2253(c); *see also Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003) ("[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners."). As the Supreme Court has explained:

> The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits. We look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable among jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it.

*Miller-El*, 537 U.S. at 336.

A COA will be granted only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327 (citation omitted). "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Id.* at 342. "Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. Moreover, "[b]ecause the present case involves the death penalty, any doubts as to whether a COA should issue must be resolved in [petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000) (citation omitted).

### III.   ANALYSIS

#### A.   *ATKINS* CLAIM

In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the Supreme Court held that the Eighth Amendment prohibited the execution of mentally retarded persons. Esparza contends that he is mentally retarded, and thus is ineligible for the death penalty. Subsequent to *Atkins*, Texas courts have followed the definition of "mental retardation" adopted by the American Association on Mental Retardation and the nearly identical definition set forth in § 591.003(13) of the Texas Health & Safety Code. *In re Salazar*, 443 F.3d 430, 432 (5th Cir. 2006). Pursuant to this test, a petitioner claiming mental retardation must demonstrate that "he suffers from a disability characterized by '(1) significantly subaverage general intellectual functioning,' usually defined as an I.Q. of about 70 or below; '(2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18.'" *Id.* (quoting *Ex parte Briseno*,

135 S.W.3d 1, 7 (Tex. Crim. App. 2004)) (internal quotation marks omitted). Esparza bore the burden of proving by a preponderance of the evidence that he is mentally retarded. *Briseno*, 135 S.W.3d at 12.   A determination of whether a person is mentally retarded is a factual finding. *Moore v. Quarterman*, 533 F.3d 338, 342 (5th Cir. 2008) (en banc); *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006).

Esparza raised his claim of mental retardation during his state habeas proceedings, and the state court held an evidentiary hearing.   During this hearing, several expert witnesses testified regarding Esparza's I.Q. scores and adaptive functioning.   Also, his sister testified about his childhood, and Esparza's prison and school records were admitted.

### 1.    Lynda Tussay

Esparza called Lynda Tussay to testify.   Tussay is a licensed professional counselor and has a master's degree in Human Development and Counseling. Tussay interviewed Esparza and administered intelligence tests.   She testified that the range of mental retardation was a 70 I.Q. or lower.   Esparza scored a 71 (standard error of plus or minus 5 points) on the Raven's Standard Progressive Matrices Test.   With respect to the Revised Minnesota Paper Formboard Test, Esparza scored a 73 (standard error of plus or minus 4 points). Tussay explained that the above two scores were within the range of borderline intellectual functioning.   On the achievement tests, Esparza was at the level of first grade math and below the level of first grade on this spelling test.   On another spelling test, he scored at the level of grade 6.3.   Esparza's vocabulary was at a grade level of 6.2, and his reading comprehension was at a 4.7 grade level.   Tussay also administered the Comprehensive Trail-Making Test, and Esparza scored better than 58 percent of the population.   On that test, a score of under 40 percent would indicate mental retardation.   With respect to the Controlled Oral Word Association Test, Esparza scored 25.82, which is nearly

four full standard deviations below the mean, which is 48.43. Tussay testified that the score indicates "a person who does not do well with any kind of form of written language."

The Vineland Adaptive Behavior Scale Test is a questionnaire for the caregiver of the person being tested regarding the subject's developmental history. Tussay explained that this test is the "essential measure, the one that most psychologists use when using the adaptive behavior scales." She administered the test to Esparza's older sister, Esther Moncado, who was Esparza's primary caregiver when he was a child. The mean score is 100, and Esparza's score was below 20, which is the "lowest score" possible.

Tussay further testified that she "can usually tell when someone is trying to not do a good job. That wasn't what he was trying to do." In her opinion, "there was no deliberate sabotage on his part. He just did not understand. He just didn't understand what I was trying to tell him." In Tussay's opinion, Esparza "meets all of the criteria for mental retardation."

During the cross examination of Tussay, the prosecutor produced two of Esparza's penitentiary packets, which included the Texas Department of Corrections Social and Criminal History page. The first packet provided that in 1985 Esparza had an I.Q. score of 86. The second packet provided that in 1993 Esparza had an I.Q. score of 88. After reviewing the packets, Tussay testified that she could not "formulate an opinion based on" them because she did "not know what they based their tests on." The packets did not provide what specific tests were administered to Esparza. She also admitted that Esparza heard from his lawyer that if he was mentally retarded, then the Supreme Court's decision in *Atkins* would bar his execution.

Additionally, Tussay testified that during her interview of Esparza she noticed that Esparza was "able to speak very well." She discovered that his family had done migrant farm work and thus "he was not really ever very rooted

in any one school." Esparza had been in special education classes and failed the ninth grade three times before dropping out of high school. Tussay also stated that Esparza told her that he failed the test for a GED but that the instructor issued a GED so that the instructor would be compensated.

Tussay also spoke with Esparza's older sister who indicated that Esparza had a "history of adaptive problems." His sister had "difficulty in teaching him how to tie his shoes, how to dress himself. It took longer and he was older before he was able to attain those skills." Esparza did not "play like the other children." For example, he did not develop "imaginary games."

### 2.      Recording of Jail Phone Calls

Esparza was moved from death row to Bexar County Jail during the time of the state writ evidentiary hearing. Sergeant Mark Gibson of the Bexar County Sheriff's office submitted a recording of three phone calls made by Esparza during his stay at county jail. The recording was played at the writ hearing. Esparza identified himself at the beginning of each phone call. He helped arrange a three-way conference call. He spoke to his attorney about the impending court proceedings. He referred to the Supreme Court's opinion in *Atkins* as the "2002 case." Esparza boasted that his attorney was very good and had gotten other inmates off death row. Esparza recounted to another person what his attorney had told him about the need to postpone the hearing. In one phone call, Esparza was advising another inmate's family regarding that inmate's civil suit against jail officials. Esparza also informed one person that he could only have visitors on Mondays and Wednesdays. He complained that the phone cards were unfairly charging too much money for the minutes provided.

### 3.      Dr. Kern

The State called Dr. Paul Kern, Ph.D., a psychologist at the University Health System, Detention Health Care Services. Dr. Kern testified that Joanna

No. 10-70009

W. Guerrero, a psychometrist with a master's degree, administered two different intelligence tests and an achievement test to Esparza. Esparza scored in the mildly mentally retarded range on the intelligence tests, and his achievement test score suggested very poor basic academic skills. Dr. Kern interviewed Esparza and interpreted the test scores.

Together Dr. Kern and Guerrero compiled a Summary of Intellectual Testing that was submitted to the state court. This report provided that, based on Guerrero's clinical impression, she estimated Esparza's intelligence was within the low average range.[1] The report provided that Esparza "displayed an extremely low level of motivation while responding to knowledge-based questions, providing a large number of 'I don't know' responses and displaying a strong hesitance to venture guesses." His responses to knowledge-based questions "were almost always incorrect." Esparza responded that the current President of the United States was "Ford." He reported that the United States flag colors are red, white, and green. Based on his responses, it was "strongly suspected that he was intentionally performing below the level of his capabilities." For example, "it was subsequently learned that although he provided a blatantly incorrect definition of a thermometer during the mental status examination, he had previously provided a correct definition for the same term during the psychological testing." Esparza performed very poorly on a simple memory task. The examiner noted that "it is rare . . . to see performance as poor as Mr. Esparza's on the task even among young children with low intelligence and relatively severe Attention/Deficit Hyperactivity Disorder." Also, during the time Esparza was not being asked knowledge-based questions, his presentation "was suggestive of a much higher level of functioning, and a clinical estimate of his intelligence based on both his general presentation and

---

[1] Guerrero did not testify at the hearing.

the available historical information would place it somewhere within the Low Average range."

Dr. Kern testified that Esparza was able to read and understand his rights. Indeed, during one meeting, Esparza stopped the interview and asked for counsel in order to obtain advice regarding whether to cooperate. Esparza retrieved his attorney's business card from his cell and successfully contacted his attorney. After consulting with counsel, Esparza decided to complete the interview. Dr. Kern testified that Esparza's presentation during the interview did not appear to be that of a mentally retarded person. Dr. Kern concluded that Esparza's motivation to do well on the I.Q. tests "was very low" and that the test results were invalid or inaccurate. Esparza's test score on the Vineland adaptive behavior scale, which had been previously administered by Tussay, indicated that he was profoundly retarded. Dr. Kern explained that a person of that level of intelligence or adaptive behavior "would be capable of doing almost nothing. A profoundly mentally retarded person, for example, would have no hope at all of ever learning language at all. They would have no hope at all of . . . ever having a job, probably. They would not be able to communicate at all." Such a person "would probably spend their whole life in an institution for the mentally retarded sitting in a corner oblivious to anything." Dr. Kern explained that a person can test below their intelligence level but not above it. He further testified that I.Q. scores generally do not change over a person's life. Dr. Kern opined that Esparza's scores of 88 and 86 in the penitentiary packets were consistent with his clinical assessments regarding Esparza's functioning. Further, Esparza's taped phone conversations suggest a higher level of functioning than the current test scores indicate. In Dr. Kern's opinion, the current test results provide "dramatic underestimates of Mr. Esparza's knowledge and ability and are best viewed as invalid."

No. 10-70009

Dr. Kern also noted that during Esparza's 2001 trial Dr. Arambula, a forensic psychiatrist, had testified that he did not have Esparza tested for mental retardation because he thought Esparza's intelligence was "normal."[2] Dr. Kern is familiar with Dr. Arambula and relied in part upon his opinion in assessing Esparza. Finally, Dr. Kern testified that, based on the test results and his clinical assessments, he did not think that Esparza was mentally retarded. Instead, as set forth in his report, Esparza's "intellectual capabilities most likely fall somewhere within the Low Average range."

### 4.   Dr. Sparks

The State also called Dr. John Sparks, a psychiatrist and medical director of the Bexar County Detention Center. Previously, in his capacity as the medical director, Dr. Sparks had seen Esparza because of a treatment issue. Dr. Sparks testified that Esparza "conveyed to me what he needed in a very clear and concise way."

At the request of the state court, Dr. Sparks interviewed Esparza and also reviewed the report issued by Dr. Kern. Dr. Sparks' evaluation of Esparza provides that he "is aware that it may lead to the death sentence if he is not retarded or may lead to life in prison if he is retarded." Dr. Sparks concluded that Esparza was not mentally retarded. Although Dr. Sparks acknowledged that the current test scores were in the mildly mentally retarded range, his evaluation provided as follows:

> [E]vidence from multiple sources suggest that the present test results provide marked underestimates of his intellectual capabilities. He displayed "pervasive evidence of poor test taking attitude characterized by low motivation, poor attention and concentration, and low task involvement and persistence."[3]  He

---

[2]   Dr. Arambula's testimony will be more fully discussed *infra* in the context of Esparza's claim of ineffective assistance.

[3]   Dr. Sparks' evaluation was quoting from Dr. Kern's report.

10

made minimal effort in the testing although his abilities to communicate and his ability to handle general living situations seem well above the mentally retarded range. He had long term gainful employment and knew how to drive and passed the drivers test.

Dr. Sparks' evaluation also found that Esparza's functioning "was well above the retardation level." Dr. Sparks found that Esparza communicated very well. Although Esparza does not write well, he "understands language better than a retarded person can." Esparza did not receive a good education and thus "has difficulty in writing communications." However, his "adaptive ablity is excellent." Dr. Sparks found that the I.Q. scores of 86 and 88 contained in the prison records were consistent with his opinion that Esparza is not mentally retarded. Although Dr. Sparks initially estimated that Esparza had borderline intellectual functioning, after hearing Esparza's taped phone conversations, he estimated that Esparza's I.Q. would be "77 or 78, closer to 80, which would be then low average."

### 5.     Esther Moncada

Esparza's older sister, Esther Moncada, testified at the hearing that Esparza was a "slow learner" and had trouble tying his shoe laces. Their mother was hospitalized after a mental breakdown when Esparza was about five or six years old. Their father moved out of state, and the children were placed in an orphanage until an uncle brought them back to San Antonio. Their father died when Esparza was ten or eleven years old. Moncada further testified that Esparza ate with his hands and had difficulty dressing himself. He dropped out of school after failing ninth grade three times and worked as a laborer. Esparza could read and write "a little."

### 6.     State Court Finding of No Mental Retardation

The state trial court denied relief on this claim, concluding that Esparza had failed to establish that he is mentally retarded. The Court of Criminal

Appeals expressly adopted this finding. Esparza challenges the state court's finding, contending that there was sufficient evidence to find that he was mentally retarded.

As previously set forth, Esparza has the burden of proving by a preponderance of the evidence that he is mentally retarded. *Salazar,* 443 F.3d at 432. The first prong of the test is whether he has significant subaverage intellectual function, usually defined as an I.Q. score of 70 or below. *Briseno*, 135 S.W.3d at 7.

We first note that Judge Mary Roman of the 175th Judicial District Court of Bexar County presided over both Esparza's trial and the state evidentiary hearing. As such, Judge Roman was able to observe Esparza testify in his own defense during his capital trial. During trial Esparza was asked to read a request that he had handwritten at the jail. From the witness stand, Esparza read aloud as follows: "I would like to ask you if I can be in segregation by myself because I no longer trust nobody because there is a lot of people that don't like me because of a charge that I have, Capital case. I would like to be housed by myself for my own safety." Moreover, we agree with the federal district court that "[t]hroughout his trial testimony, [Esparza] furnished coherent, even combative testimony fully responsive to both his own trial counsel's and the prosecutor's questions and demonstrated a detailed understanding of the testimony and other evidence introduced during his capital murder trial."

Additionally, Esparza's penitentiary packets provided that he had an I.Q. of 86 in 1985 and an I.Q. of 88 in 1993. The experts' testimony provided that these scores are well above what a mentally retarded person would score. Dr. Kern testified that a person's intelligence score generally is stable and does not change over a lifetime. There was expert testimony that although a person can score below their actual level of intelligence, a person cannot score above their actual level of intelligence.

No. 10-70009

In stark contrast to his previous I.Q. scores in the low average range in his penitentiary packets, Esparza scores fell within the range of mental retardation when he knew that he was being tested to determine whether he was eligible for the death penalty. Indeed, one test score placed him in the range of profoundly retarded. Dr. Sparks, Dr. Kern, and Guerrero, who administered the tests for Dr. Kern,[4] believed that Esparza had low motivation to actually perform on the tests and believed the test results were invalid. Dr. Sparks testified that Esparza understood that if he was deemed mentally retarded then he could not be executed.

On the other hand, Esparza's expert, Tussay, discounted the higher previous I.Q. scores of 86 and 88 because the packets did not provide what test was used. Tussay concluded that Esparza was mentally retarded. Tellingly, Tussay admitted that this case was the first time she had evaluated an incarcerated individual for mental retardation. Both Dr. Kern and Dr. Sparks, however, had years of experience interacting with incarcerated individuals. Indeed, Dr. Kern was a psychologist at the University Health System, Detention Health Care Services, and Dr. Sparks was the medical director of the Bexar County Detention Center. Finally, Dr. Arambula, Esparza's expert, testified during the punishment phase of the capital murder trial and opined that Esparza was of normal intelligence and thus he had not had Esparza tested for mental retardation. Under these circumstances, Esparza has not shown that the finding of no subaverage intellectual functioning is debatable among reasonable jurists. Because Esparza has failed to make a substantial showing on the first prong of the test, there is no need to address the remaining two prongs. *See Salazar*, 443 F.3d at 432 ("To state a successful claim, an applicant must satisfy

---

[4] Guerrero's clinical impression of Esparza was that his intelligence was in the low average range.

all three pongs of this test." (citation omitted)).  Accordingly, we DENY a COA with respect to his *Atkins* claim.

### B.    JURY FINDING ON MENTAL RETARDATION

Citing *Ring v. Arizona*, Esparaza also contends that he is entitled to obtain a jury finding on the issue of whether he is mentally retarded.  536 U.S. 584 (2002).  In *Ring,* the Supreme Court held that because a death sentence was authorized only if an aggravating factor was present, the Sixth Amendment required that the aggravating factor must be proved to a jury.  *Id.* at 603–09. This Court has rejected the instant claim, explaining that neither *Ring* nor *Atkins* "render the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt."  *In re Johnson*, 334 F.3d 403, 405 (5th Cir. 2003); *see also Woods v. Quarterman*, 493 F.3d 580, 585 n.3 (5th Cir. 2007).

Moreover, contrary to Esparza's argument, the holding in *Ring* cannot be applied retroactively on collateral review.  As a general matter, the Supreme Court has explained that "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review."  *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).  Although Esparza recognizes that holding, he nonetheless contends that the decision should be revisited.  We, of course, are bound by the Supreme Court's decision.  *United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998).  Further, this Court has rejected his precise contention in the context of a claim of mental retardation, explaining that this "claim does not meet the requirements of § 2244(b) because the claim that a jury must determine mental retardation does not rely upon a new rule of constitutional law made retroactive by the Supreme Court."  *In re Woods*, 155 F. App'x 132, 134 (5th Cir. 2005).  Accordingly, we are constrained to find that this

claim is not debatable among reasonable jurists.  We DENY his motion for a COA as to this claim.

## C.    INEFFECTIVE ASSISTANCE OF COUNSEL

Esparza argues that his Sixth Amendment right to effective assistance of counsel was violated during the sentencing phase of his trial.  He contends that his trial counsel failed to adequately investigate and present mitigating evidence with respect to his mental retardation.

To establish ineffective assistance of counsel, Esparza must show (1) defense counsel's performance was deficient and (2) this deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  We must find that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  *Id.*  The Supreme Court instructs courts to look at the "norms of practice as reflected in the American Bar Association and the like" and to consider "all the circumstances" of a case.  *Id.* at 688.  While "[j]udicial scrutiny of counsel's performance must be highly deferential," Esparza can demonstrate deficient performance if he shows "that counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  However, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  *United States v. Webster*, 392 F.3d 787, 793 (5th Cir. 2004) (quoting *Strickland*, 466 U.S. at 689).  *Strickland*'s "prejudice" prong requires a reasonable probability that, but for the deficient performance of his trial counsel, the outcome of his capital murder trial would have been different.  *Strickland,* 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

### 1.    Performance Prong

No. 10-70009

As previously set forth, Esparza contends that trial counsel rendered ineffective assistance by failing to investigate and present mitigating evidence of his mental retardation during the sentencing phase of his trial. In determining whether trial counsel's performance was deficient, our "focus [is] on whether the investigation supporting counsel's decision not to introduce [additional] mitigating evidence of [a petitioner's] background *was itself reasonable*." *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003). Thus, we must consider the reasonableness of trial counsel's investigation.

With respect to investigation, the record reveals that counsel requested the appointment of a forensic psychologist, a private investigator, and a DNA expert. Counsel also filed numerous discovery motions. Counsel interviewed at least two members of Esparza's family—the two sisters who testified at the punishment phase of trial. Because Esparza has not submitted an affidavit from trial counsel, the record does not contain the full extent of counsel's investigation. However, as previously stated, Esparza must demonstrate that counsel's performance was deficient, *Strickland*, 466 U. S. at 687, and there is a strong presumption that counsel's investigation was reasonable. *Webster,* 392 F.3d at 79.

Counsel obtained the appointment of Dr. Arambula, a forensic psychiatrist. Dr. Arambula evaluated Esparza and testified during the punishment phase that he could not identify a specific mental illness. Dr. Arambula also testified that Esparza was more unstable than a "normal" person because when he was six years old his mother was institutionalized for mental illness. As a result, he was temporarily sent to an orphanage. Although unable to diagnose an illness, Dr. Arambula suspected that Esparza had inherited a "genetic load" from his mentally ill mother.

Dr. Arambula testified that after Esparza's mother remarried and his father died, Esparza's stepfather would regularly beat him. It was Dr.

16

Arambula's opinion that the neglect and abuse Esparza suffered as a child did not allow him to trust other people and made him prone to disagreement and physical altercations. Dr. Arambula explained that a victim of domestic violence can repeat the violent behaviors he has suffered.

Dr. Arambula noted that Esparza obtained a GED in prison. On cross examination, the prosecutor asked whether he had administered any I.Q. tests on Esparza. Dr. Arambula responded: "No. I didn't believe that I needed to, based on the evaluation." The prosecutor then inquired: "Because he seems to have normal intelligence?" Dr. Arambula responded: "Yes." Accordingly, defense counsel had a mental health expert evaluate Esparza, and the expert's conclusion was that Esparza was of "normal intelligence." Moreover, as previously discussed, the evidence Esparza relies on to demonstrate his mental retardation is unpersuasive. Under these circumstances, Esparza has failed to make a substantial showing that counsel's performance with respect to investigating the issue of mental retardation was deficient.

It is not clear from the briefing, but it also appears that Esparza is arguing that counsel's presentation of the mitigating evidence about his childhood is deficient. Counsel was able to elicit testimony that Esparza's mother was institutionalized when he was six years old, and, as a result, he was sent temporarily to an orphanage. Subsequently, Esparza and his siblings were sent to live with their grandmother. His sisters testified that his mother was in the hospital once or twice a year due to her mental illness. The testimony also demonstrated that Esparza was beaten by his stepfather. Further, one sister was asked "how much schooling" Esparza had, and she replied: "Not much. . . . I know he stopped going to school because he had to help my mom to pay bills and all." Esparza then began working in a restaurant and in construction. Additionally, counsel elicited testimony from Dr. Arambula that the highly structured setting in prison would make Esparza less likely to be a future

danger, which is mitigating evidence with respect to the first question given to the jury after the punishment phase.[5]   Although Esparza claims counsel's questioning of the mitigation witnesses was "very superficial," he has wholly failed to explain what else counsel should have elicited from the mitigation witnesses.  As such, he has failed to demonstrate that reasonable jurists would find debatable his claim that counsel's performance with respect to investigating and presenting the evidence in mitigation was deficient.

### 2.     Prejudice Prong

Because Esparza made an insufficient showing on the first prong of the test, it is unnecessary for this Court to address the second prong–whether counsel's deficient performance prejudiced him.  *Strickland,* 466 U.S. at 689.  Nonetheless, we briefly state that it is clear that Esparza has failed to make a sufficient showing of prejudice.  In the context of a claim that counsel failed to discover and present mitigating evidence, to determine whether a petitioner has shown the required prejudice, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

Here, the aggravating evidence included evidence that Esparza kidnapped a 7-year old girl from her home in the middle of the night, raped and sodomized her, and strangled her to death.  Esparza had a previous conviction for aggravated sexual assault, and the victim of that crime testified at the punishment phase of this trial.  She recounted how Esparza hit her in the head

---

[5] The first question is: "Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, Guadalupe Esparza, would commit criminal acts of violence that would constitute a continuing threat to society?"  The second question is:

> State whether, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or are sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

with his gun and raped her at gunpoint after asking her for a ride home in her car. Another victim testified that Esparza choked her and attempted to rape her. Shortly before the instant crime, Esparza put his hand underneath the clothes of a little girl as she was sleeping. The evidence showed that as a juvenile he attempted to rob another child of his mini-bike at knife point. Esparza also was the "getaway" driver when two other individuals were stealing parts from a vehicle. Finally, Esparza had received disciplinary reports in prison, including an incident in which he was kicking another inmate in the side while the inmate was lying on the ground.

With respect to his claimed evidence of mental retardation, as we previously discussed, the evidence indicates that Esparza was not actually mentally retarded. Thus, in light of the aggravating evidence presented to the jury, we are unpersuaded that Esparza has made a substantial showing that there is a reasonable probability that, had his additional mitigating evidence been presented, the outcome of the sentencing hearing would have been different. In other words, we are persuaded that reasonable jurists would not find Esparza's claim of ineffective assistance of counsel debatable. We therefore DENY a COA as to his claim of ineffective assistance of counsel.

IV.   CONCLUSION

For the above reasons, the motion for COA is DENIED.